DeNobili Cigar Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 107651.   Promulgated February 25, 1943.

*P. S. Hill, Esq.,* for the petitioner.
*T. H. Lewis, Jr., Esq.,* for the respondent.

## OPINION.

Arundell, *Judge:* Proposed deficiencies in income (withholding) tax amounting to $2,630, $76,677.22, and $51,263.58 for the years 1936, 1937, and 1938, respectively, are the subject of the present controversy. The issues are whether amounts paid in redemption of preferred stock were essentially equivalent to the distribution of taxable dividends; and, if so, whether they should be treated as such in the hands of nonresident alien stockholders. The facts are found as stipulated. The returns for the periods involved were filed with the collector for the first district of New York.

Petitioner was incorporated under the laws of New York in 1912. Its business is the manufacture and sale of tobacco and cigars. All of

its original capital stock, consisting of 5,500 shares of nonvoting 6 percent preferred stock of $100 par value ($550,000) and 15,000 shares of common stock with $50 par value ($750,000), was issued for the assets and good will of a partnership. The common stock was issued to 59 individuals, the largest block, 3,911 shares, being issued to Prospero DeNobili, petitioner's president; and the preferred stock was issued to 56 stockholders, largely the same individuals as the common stockholders. Practically all the stockholders were nonresident aliens residing in Italy. The certificate of incorporation required a portion of the net earnings for each half year to be used to retire shares of the preferred stock.

Petitioner's business was markedly successful. From 1914 until the peak year of 1929 the gross sales and net profits showed a continued and substantial growth, as disclosed by the following figures:

| Year | Gross sales | Net profits |
|---|---|---|
| 1914 | $1, 585, 707 | $204, 478 |
| 1923 | 3, 858, 444 | 619, 973 |
| 1929 | 4, 533, 753 | 906, 110 |

The expansion of the business is reflected by inventories, which were as follows at the end of each listed year:

| | 1914 | 1923 | 1929 |
|---|---|---|---|
| Raw materials | $403, 608 | $814, 249 | $1, 378, 564 |
| Work in progress | 29, 032 | 59, 184 | 68, 982 |
| Finished products | 212, 062 | 460, 655 | 663, 657 |
| Total | 644, 702 | 1, 334, 088 | 2, 111, 203 |

In addition to dividends on its outstanding preferred stock, petitioner distributed substantial cash dividends to its common stockholders during each of the years 1913 to 1929, inclusive, the total for the whole period aggregating $4,683,000. Between 1919 and 1929 the smallest cash dividend in any one year was $270,000, representing a rate of $18 on the $50 par value common stock, and the largest in amount was $480,000, a rate of $32. Notwithstanding these large cash dividends, and after giving effect to the capitalization of an additional $1,375,300 of earnings by the distribution of stock dividends, as will be set forth below, petitioner's surplus and undivided profits increased from $58,131 at December 31, 1912, to $1,198,089 at December 31, 1929.

After 1929 the economic depression and competition from numerous small factories gradually reduced petitioner's volume of business and, while petitioner continued to make money, both gross sales and profits steadily declined, as follows:

| Year | Gross sales | Net profits |
|------|------------|-------------|
| 1930 | $4,287,865 | $772,143 |
| 1933 | 2,174,156 | 306,797 |
| 1936 | 1,696,455 | 168,899 |
| 1939 | 1,280,090 | 154,053 |

During these years there was a sharp reduction in inventories of raw materials and work in production, coupled with an increase until 1936 of finished products on hand, as follows:

|  | 1930 | 1933 | 1936 | 1939 |
|--|------|------|------|------|
| Raw materials | $1,384,429 | $442,811 | $293,490 | $167,228 |
| Work in progress | 62,071 | 39,558 | 35,481 | 36,235 |
| Finished products | 810,775 | 1,132,052 | 1,226,076 | 256,829 |
| Total | 2,257,275 | 1,614,421 | 1,555,047 | 460,292 |

Between 1930 and 1936, inclusive, petitioner distributed cash dividends of $2,400,000 to its common stockholders as follows: 1930, $495,000; 1931, $525,000; 1932, $540,000; 1933, $300,000; 1934, $240,000; 1935, $195,000; and 1936, $105,000. No cash dividends as such were paid in 1937 or 1938, and only $60,000 was paid in 1939. Surplus and undivided profits, which were $1,241,764 at the end of 1930, declined to $978,896 at December 31, 1933. A stock dividend of $750,000 distributed in 1934, as set forth below, reduced them to $176,368 on December 31, 1934; they reached a low of $111,457 at the end of 1937, and amounted to $229,607 on December 31, 1939.

As stated above, the articles of incorporation required the retirement of the preferred shares out of a portion of the annual earnings. Pursuant to this requirement all but 1,217 of the original 5,500 shares had been redeemed by the end of 1923. On November 28, 1923, a certificate of increase of capital stock of petitioner was filed, adding to its then authorized capital stock 60,000 shares of 8 percent cumulative second preferred stock, par value $25 ($1,500,000). The certificate provided that 1,200 shares ($30,000 par value) of such second preferred stock should be called and redeemed at par on September 30, 1926, and a like number of shares semiannually thereafter.

At a meeting of petitioner's board of directors on January 30, 1924, it was resolved to sell 5,200 shares of the second preferred stock at par ($130,000) and to use $129,610 of the proceeds of such sale to retire the remaining 1,217 shares of first preferred stock. Such shares were accordingly redeemed on April 1, 1924. The minutes of the meeting of January 30, 1924, translated into English, read in part as follows:

The President stated that since all the First Preferred shares were being reimbursed on March 31, 1924 there was no longer the necessity of withdrawing from the net earnings any amount as a reserve fund and for the reimbursement

of preferred and that there was left a balance of $322,486.80 of net earnings to distribute. That the surplus was represented by $708,951.92 constituted by a reserve fund of $280,651.92 and $428,300.00 of Preferred reimbursed, and that this surplus, after the reimbursement of all Preferred stock, could be distributed to common stockholders from reserve and accumulation funds of previous years. That as a consequence between the surplus of $708,951.92 and net earnings (to be distributed) from the second semester of 1923 for $322,486.80 the company had $1,031,428.72 which could be distributed as dividend and division of reserve and accumulated earnings of previous years. That, however, in order not to weaken the company's position, he proposed to distribute for each common share $50.00 in Second Preferred stock, that is, 2 shares of Second Pref. stock for each common share and $18.75 in cash, deducting the 6 dollars paid in advance.

A stock dividend of 30,000 shares of second preferred stock ($750,000) was accordingly declared and paid to the common stockholder on April 1, 1924; and cash dividends aggregating $18.75 per share on the common stock were paid on January 26 and March 31, 1924, a total of $281,250.

A portion of the remaining shares of second preferred stock was issued for cash, but for the most part they were issued as dividends on the common stock during the balance of the year 1924 and during 1925 and 1926. The final result was that all the authorized 60,000 shares of second preferred stock had been issued by October 1, 1926. Of these, 47,812 shares ($1,195,300) had been issued as dividends, and 12,188 shares ($304,700) for cash. The stock sold for cash was sold to 78 persons, and 193 individuals received second preferred stock as dividends on their common stock.

On November 27, 1928, a second certificate of increase of capital stock of petitioner was filed, adding a new issue of 120,000 shares of 6 percent cumulative third preferred stock, par value $25 (a total of $3,000,000). During 1929, 5,250 of these shares ($131,250) were sold for cash to 48 individuals. On September 30, 1929, 7,200 shares ($180,000) of the third preferred stock were declared and paid as a dividend to 305 common stockholders. The second certificate of increase contained no provision regarding retirement or redemption of the third preferred stock.

On January 31, 1934, a stock dividend of 30,000 shares ($750,000) of third preferred stock was declared and paid upon the common stock. This dividend was received by 258 individuals.

Between 1929 and 1936 there had been an excess of production of cigars over sales. At the end of 1929, against a monthly sale of about 10,000,000 cigars, petitioner had a stock of 37,000,000 cigars; whereas on June 30, 1936, the inventory amounted to about 68,000,000 cigars against a monthly sale of a little over 2,000,000. It was, therefore, imperative to reduce these inventories and the only means of doing this was to suspend or limit production. Petitioner was confronted with labor troubles and sit-down strikes. The factory was in a con-

tinuous turmoil until, in October 1937, confronted with the threat of another sit-down strike, the factory was completely closed. It remained closed for approximately two years, during which the stock of cigars was reduced from about 68,000,000 to less than 14,000,000. This inventory liquidation resulted in the accumulation of considerable cash. On August 30, 1937, a certificate of reduction of capital stock of petitioner was filed whereby the second preferred stock was eliminated. It will be recalled that this stock had been issued with a proviso that 2,400 shares ($60,000) would be retired annually from earnings beginning on September 30, 1926. From that date until August 1937, 26,400 shares ($660,000) out of the issued 60,000 shares had been retired, the particular shares to be retired having been drawn by lot. Pursuant to the certificate of reduction filed on August 30, 1937, the remaining 33,600 shares ($840,000) were redeemed at par and retired. Of the stock redeemed in 1937, $766,775 in amount was owned by nonresident aliens.[1] Of the 1,200 shares redeemed on July 16, 1936, 1,052 shares ($26,300) were owned by nonresident aliens.

On September 9, 1938, petitioner filed a certificate of reclassification of its shares, whereby authority was derived to retire the third preferred stock. Pursuant thereto, on November 30, 1938, petitioner redeemed by lot approximately one-half, or 21,220 shares, of its outstanding third preferred stock. Of the shares so redeemed, 20,505½ shares ($512,637.50) were owned by and redeemed from nonresident aliens.

The Commissioner determined that the distributions in redemption during the tax years were made in such manner and at such times as to constitute the equivalent of taxable dividends. Sec. 115 (g), Revenue Act of 1936 and 1938.[2] Accordingly, he held that nonresident alien stockholders were subject by virtue of section 211 (a) to tax upon such distributions, and that petitioner should have withheld a

---

[1] In connection with the redemption of $840,000, the amount of $504,000 was actually paid to stockholders on September 30, 1937, and the balance of $336,000 was entered on petitioner's book as accounts payable to the stockholders. These accounts payable were paid on March 15, 1938. Respondent has filed an amended answer requesting that the deficiency for 1938 be increased by $33,600, as protection against a holding that the amount of $336,000 was not subject to tax until the latter year. Petitioner makes no argument on this point, and from all that can be determined on the facts as stipulated the doctrine of constructive receipt may well be applicable in 1937. In any event the amount of tax will be the same whether it falls in 1937 or 1938, and, since petitioner does not contend otherwise, we shall treat the full $840,000 as having been actually or constructively paid and received in 1937, as determined in the notice of deficiency.

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

tax of 10 percent upon the amounts paid to them, as prescribed by section 143 (b).

We shall first consider petitioner's contention that section 115 (g) never applies to distributions in liquidation received by nonresident aliens. Section 211 (a) of the applicable revenue acts imposes a tax of 10 percent upon income received by nonresident aliens from "interest * * *, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income * * *"; and the duty to withhold the tax is placed by section 143 (b) upon any person making payments of such income. Nonresident aliens are not taxed upon capital gains from the sale or exchange of capital assets. Inasmuch as distributions in liquidation of stock are treated generally in section 115 (c) as payments received in exchange for the stock, the Treasury regulations provide that there shall be no duty to withhold the tax from distributions in partial or complete liquidation. Art. 143-1, Regulations 94 and 101. Petitioner argues that the regulations govern this case, asserting that the word "dividends" in section 211 (a) means only dividends in the usual sense, and a liquidating distribution, even if equivalent to a taxable dividend, is not a "fixed or determinable annual or periodical gain."

We cannot accept this reasoning. Section 115 (g) was enacted primarily to prevent the distribution of corporate earnings free from the tax upon ordinary dividends. It provides an exception to the usual taxation of amounts distributed in liquidation, so that if a liquidating distribution can not be distinguished in time or manner from an ordinary dividend it is removed for tax purposes from the usual rule prescribed by section 115 (c). It is then taxed as an ordinary dividend and neither the statute nor the regulations exclude nonresident aliens from this treatment. The words "shall be treated as a taxable dividend" must, we think, be taken to mean that such a distribution will be so treated for all purposes within Title I of the revenue act. Since nonresident aliens are subject to tax upon dividends, we conclude that they are subject to tax upon amounts that are to be treated as dividends.

The principal issue, whether a distribution in redemption is the equivalent in time and manner of a taxable dividend, has been litigated often. Conflicting views have been expressed and differing criteria utilized in applying to actual facts the vague statutory mandate. The Second Circuit, to which an appeal would lie in the present case, has taken the position that "if redeemed shares have been issued bona fide, § 115 (g) * * * never applies." *Patty* v. *Helvering*, 98 Fed. (2d) 717. By "bona fide," the shares "must be understood as shares issued for business purposes. *Gregory* v. *Helvering*, 293 U. S. 465." The First Circuit holds that the sub-

section applies to retirements "made in pursuance of a plan formed at the time when the stock was originally issued, or as a cloak for the distribution of earnings." *Commissioner* v. *Cordingley*, 78 Fed. (2d) 118. Other courts have decided that the test is "the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation." *Flanagan* v. *Helvering*, 116 Fed. (2d) 937; *Hirsch* v. *Commissioner*, 124 Fed. (2d) 24; *Hill* v. *Commissioner*, 66 Fed. (2d) 45. In *Smith* v. *United States*, 121 Fed. (2d) 692, the Third Circuit gave its opinion "that the bona fides in a company's capitalization of its earnings is immaterial * * *." We have said that the issue may be resolved by determining whether the redemption "was apparently dictated by the reasonable needs of the business or whether, on the other hand, it originated with or was designed for the benefit of the stockholders who received its fruits." *A. E. Levit*, 43 B. T. A. 1077, 1084.

While the burden was on petitioner in the instant case to show error in the Commissioner's determination, the record leaves us at a loss to understand the reasons which prompted the issuance of the redeemed shares as stock dividends. Petitioner's case is based upon an alleged showing of business necessity. It states on brief: "The declarations of stock dividends were dictated by business necessity, increase of business and increase of inventories and their redemption, likewise, by business necessity, decrease of inventories and an increase of cash which could not be profitably employed in the business."

While it is true that business was expanding from 1924 to 1926 when the second preferred stock was distributed, petitioner's position does not explain why third preferred of $750,000 was distributed in 1934. There was then no increase of business or increase of inventories; instead, business had steadily declined since 1929. Sales in 1933 were less than half what they had been in 1929; net profits roughly one-third; raw materials less than one-third; and work in progress had diminished about 40 percent. Inventories as a whole had been reduced by approximately $500,000, though decreased sales had resulted in a substantial growth in finished products on hand. Surplus and undivided profits were $220,000 less than in 1929. At a time when the company had a large amount of cash on hand ($316,000) and when every effort was being made to reduce inventories of finished cigars, no explanation is offered why it was necessary, or even sound policy from the corporation's point of view, to capitalize earnings that were invested in inventory and thus to pay 6 percent for the use of funds which petitioner was already free to use and which, as it was endeavoring to do, were to be converted into cash as soon as possible.

Nor does the necessity for building up a capital in 1924 and 1926 explain why preferred stock carrying cumulative dividends of eight percent was sold and the proceeds used to retire, before their ordinary redemption date, the balance of the original preferred stock carrying only a 6 percent dividend. If permanent capitalization were required, it is difficult to understand why the shares issued to effect that capitalization were made a charge upon future earnings of the business—why they were issued with a stipulation for redemption at a specified annual rate, commencing the second year after issuance. If there were a need for capital, there is no explanation for the large cash dividend which was distributed along with the stock, or for the other cash dividends paid each year during this period. Business necessity does not explain why, in 1929, when 7,200 shares of second preferred had been retired, 7,200 shares of third preferred were issued as a stock dividend.

The conclusion we draw from all the facts is that the stock dividends were distributed for the advantage of petitioner's stockholders rather than for any benefit that would accrue to the corporation. The second preferred stock appears to have been issued as paper evidence of the common stockholders' equity in accumulated earnings, carrying with it the assurance that those earnings would themselves be distributed during the ensuing years. As to the third preferred shares distributed in 1934, we are impelled to the conclusion that the issuance was intended to be temporary in nature, evidencing surplus invested in inventories which from a business standpoint were soon to be liquidated. As soon as that conversion had occurred to a sufficient degree, one-half of the shares were called in and replaced by cash. The minutes of the meeting at which the distribution of second preferred stock was authorized disclose that, instead of satisfying some needs of the business, the distribution was contemplated as a division of reserve and accumulated earnings among the stockholders. And the president's testimony is to the effect that at the time of the distribution of third preferred stock the company had a surplus of $978,000, which had been invested in cigars; that it was impossible to distribute the cigars as a dividend; and that "therefore, it was resolved to distribute third preferred stock for an amount of $750,000."

In our opinion the issuance and redemption of these shares under the circumstances recited serve to bring these distributions within the provision of section 115 (g).

What we have said above is limited to the redemption of stock originally issued as a dividend. As to stock issued for cash at par and later redeemed at par, we think it obvious that no distribution of earnings has been made. The parties have stipulated that of the stock

redeemed, the amounts shown on schedules 6a and 9a "were originally issued for cash and redeemed from the stockholders * * * named in said schedules." The annexed schedules are entitled "Redemptions in 1936 and 1937 [and 1938] of Second Preferred [and Third Preferred] Stock Originally Acquired for Cash Either from the Corporation Upon Issuance or Thereafter From Others." They disclose that 1,575 shares of second preferred stock in 1936 and 1937 and 1,101 shares of third preferred in 1938 were so redeemed from nonresident aliens. We hold that as to such amounts the distribution was not equivalent to a taxable dividend.

For its final argument petitioner asserts that section 115 (g) does not apply to stock redeemed from others than the original stock dividend recipients; in other words, stock that has been transferred by the distributee shareholder prior to the time of redemption. *Parker* v. *United States*, 88 Fed. (2d) 907, reached what it termed the "somewhat paradoxical" result that a redemption might be a dividend as against the original recipient of the stock and not a dividend "as against the holder who acquired it for full value from the original recipient." But where the transfer was merely from a decedent to his estate upon death, the change of ownership was considered immaterial for purposes of section 115 (g). *Flanagan* v. *Helvering, supra.* The reason for the rule in the *Parker* case is that if a stockholder has acquired his redeemed stock for cash, he should be allowed to recover his capital outlay.

The parties in the instant case have stipulated a list of the persons who received stock dividends and also a list of those from whom stock was redeemed. Some of the latter are not listed as recipients of stock dividends, and petitioner contends that they purchased their stock from others who received it as a stock dividend. The record does not show that the transfers were for consideration, but petitioner urges us to accept the presumption that the transfers were sales.

After examination of petitioner's computations on brief, based upon the schedules attached to the stipulation, we can not act upon the presumption that the stockholders who took part in the redemption but who were not stockholders at the time of the stock dividends were purchasers for value. The reason for this is that in the great majority of instances, and this is true to a greater degree with respect to the third preferred stock, where shares were redeemed from a person who had neither purchased them from the corporation nor received them as a stock dividend, an individual with the same last name had received a stock dividend and had not taken part in the redemption. For example, 10 shares are shown to have been redeemed from one Guglielmo Alvino, who was not a stock dividend recipient; but 10 shares had been received as a dividend in 1934 by Raffaele Alvino, and no shares

were redeemed from the latter. Similarly, 6 shares were redeemed from Arnaldo Ascarelli, who received no stock dividend, but 12 shares had been distributed to Angelo Ascarelli and none redeemed from her; 10 shares each were redeemed from Luigi Pier Bertagna and Paolo Bertagna, who received no dividend, but 38 shares had been issued to Pietro Bertagna and Remigio Bertagna, from whom none were redeemed. And so on, with the bulk of the shares in petitioner's computation. Petitioner's table even includes at least five instances of stock which appears to have been issued to persons while single but redeemed after marriage; for example, shares were issued to Bianca Scartezzini and redeemed from Bianca Scartezzini Marengo; to Giuseppina Ballerini and from Giuseppina Ballerini Marini; to Teresa Quartieri and from Teresa Quartieri Martellini.

In the light of these facts there is no presumption that the transferees were purchasers for value. If we were to follow the rule of the *Parker* case, the burden was on petitioner to bring itself within the rule. We can not assume that any· of the shares, except those shares referred to above which are stipulated to have been purchased "from the corporation upon issuance or thereafter from others," had been acquired for valuable consideration by the persons from whom they were redeemed.

*Judgment will be entered under Rule 50.*