ADAM A. ADAMS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4109. Promulgated June 29, 1945.

*Sydney A. Gutkin, Esq.*, for the petitioner.
*Jonas M. Smith, Esq.*, for the respondent.

352

**OPINION.**

OPPER, *Judge*: An opinion in this proceeding was promulgated on April 26, 1945 (4 T. C. 1186) which, pursuant to subsequent order, was referred to the Court for review and is to be considered superseded by the present opinion.

As in *Alice H. Bazley*, 4 T. C. 897, the first question for disposition here is whether the nonrecognition provisions of section 112 are applicable to the receipt by petitioner of debentures in a transaction involving the cancellation of previously outstanding common stock and the issuance of new no par common. This in turn depends upon whether we can find as a fact that there was a legitimate purpose of the corporate business for the distribution to petitioner of the debentures.

The resolution of this problem requires an examination of the purposes of the "reorganization," as presented by petitioner. The first of these, designated as the "principal" purpose, was a belief that the existence of debenture bonds, available for use as collateral, would facilitate the refinancing of the corporation's mortgage indebtedness, then impending. Petitioner testified that he believed debenture bonds might be more acceptable than common stock if additional collateral were required in negotiating a new loan. The refinancing arrangements were successfully concluded, but the record is completely silent as to whether the bonds were used in that connection. We may fairly assume, therefore, that they were not.

We are not impressed with the validity or the existence of this alleged purpose. It is difficult to see how debenture bonds of this nature, inferior to the mortgage lien itself, would have been as attractive to a mortgage bondholder of the corporation as common stock, which would at least have provided the creditor, already secured by a mortgage on the debtor's property, with some additional security in the form of a voice in the management of the corporation in the event of default and pending foreclosure.

The second reason for the "reorganization," according to petitioner, was his desire to give some securities of the corporation to his two sons, who were associated with him in the business of the corporation, without surrendering any of his stock control over the company. He did give them bonds of a total face value of $48,000, representing about 16 percent of his holdings. This was obviously a personal reason having no connection with the corporate business.

The remaining two reasons may be considered together. They were the saving of corporate income tax resulting from the right to deduct interest paid on the bonds, and the saving of New Jersey franchise tax resulting from the decrease in the amount of stock. These purposes are equally unavailable when considered from the standpoint of the corporate business. As a result of the procedure adopted the corporation undertook an annual obligation of 6 percent of $295,150 in interest charges in order to secure the reduction of a few hundred dollars in state franchise taxes and of an indeterminate amount of Federal income tax which would necessarily be less than the interest obligation. If the money were to be borrowed from strangers, it seems evident that this could not but be a losing transaction for the corporation. As we said in *De Nobili Cigar Co.*, 1 T. C. 673, 679; affd. (C. C. A., 2d Cir.), 143 Fed. (2d) 436:

> * * * no explanation is offered why it was necessary, or even sound policy from the corporation's point of view, to capitalize earnings * * * and thus to pay 6 percent for the use of funds which petitioner [the corporation] was already free to use * * *

See *Talbot Mills*, 3 T. C. 95; affd. (C. C. A., 1st Cir.), 146 Fed. (2d) 809; certiorari granted, 325 U. S. 844.

That the dominant stockholder rather than a stranger happened to be the person to whom the interest would be paid can account for the company so conducting itself in spite of the disadvantage to it. But while furnishing an explanation for the action, it offers no evidence of any independent benefit to the corporation itself as distinguished from the reciprocal advantage to petitioner as an individual from the receipt of the interest payments, and thus falls short of constituting the corporate business purpose which we are required to find in such cases. *Gregory v. Helvering*, 293 U. S. 465; *Alice H. Bazley, supra.*

Once the transaction is removed, as we accordingly think it must be, from the scope of section 112, a distribution of the corporation's debentures can partake of the nature of a taxable dividend to the same extent as any other distribution of property or of the stock of a wholly different corporation. *Doerschuck v. United States* (Dist. Ct., E. Dist. N. Y.), 274 Fed. 739; see *Peabody v. Eisner*, 247 U. S. 347. Our inquiry is then directed to whether under the provisions of section 115 (g) the distribution was essentially equivalent to a taxable dividend. *Edith*

*B. Bass*, 45 B. T. A. 1117; reversed (C. C. A., 1st Cir.), 129 Fed. (2d) 300. The contention is made that because the corporation's book surplus was undisturbed there could have been no dividend distribution.[1] For that position, to be sure, the reversal in *Edith B. Bass, supra*, can be cited as at least partial authority. With the greatest deference, however, we remain of the opinion that the decision of the Board of Tax Appeals in that case was correct, and we feel obliged to adhere to it rather than to follow the reasoning of the opinion of reversal.

The argument that by a bookkeeping entry purporting to make a distribution from capital and without disturbing earned surplus a corporation can be held to have accomplished that result seems to us to lose sight of the express statutory provision and to treat as cause what is in reality effect. Except for a distribution in liquidation, we must start with the premise that "every distribution is made out of earnings or profits to the extent thereof and from the most recently accumulated earnings or profits," because the statute so commands in unmistakable language.[2] We do not understand there is any suggestion that these were distributions in liquidation and nothing in the record warrants the assumption that they were. Internal Revenue Code, sec. 115 (c) and (i). If as a consequence there were earnings and profits, the distribution was a dividend or its essential equivalent, and the effect upon the corporation's earned surplus for purposes of future tax computation would be to reduce it, regardless of the treatment of that surplus on the corporation's books. Cf. *Commissioner* v. *Bedford Estate*, 325 U. S. 283; *August Horrmann*, 34 B. T. A. 1178. "\* \* \* 'earnings and profits' in the tax sense although it does not correspond exactly to taxable income does not necessarily follow corporate accounting concepts either." *Wheeler* v. *Commissioner*, 324 U. S. 542. We are accordingly unable to agree that the mere dealing with the capital account in such a way that the distribution is treated on the corporate books as a diminution of capital rather than of earned surplus can have any binding influence on the determination which we are required to make. That is the effect of *Edith B. Bass, supra*, where we said, p. 1121:

\* \* \* The issuance of the preferred stock in the present case gave to the recipients an interest different from that represented by their former stockholdings. That was the intent and purpose of the change. The corporation

---

[1] A similar argument was made in *Alice H. Bazley, supra*, but we found it unnecessary to deal with it under the facts there brought forth.

[2] Internal Revenue Code, section 115 (b) :

"(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113."

had more than sufficient earnings accumulated after February 28, 1913, to pay a dividend equal to the value of this preferred stock. The petitioner concedes that the issuance of stock involving the capitalization of earnings could result in a taxable dividend, but contends that this was a "split-up" involving merely a change in the character and number of shares by which existing capital continued to be represented and was not a taxable dividend. It is immaterial that the corporation did not capitalize any earnings to support the issuance of the preferred stock, since section 115 (b) provides that "every distribution is made out of earnings or profits to the extent thereof. * * *"

This statement seems warranted by the observation in *Helvering* v. *Gowran*, 302 U. S. 238, that:

* * * under section 115 (b) * * * [the distribution of preferred stock] was presumed to have been made "out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." In no sense, therefore, can it be said to have been "held" by Gowran prior to its declaration. Since the proceeds were therefore not "capital gains," they were taxable at the normal and surtax rates applicable to ordinary income.

Having found, as we think we must, that such earnings as the corporation had were distributed by means of the debentures to the extent of their value, it becomes necessary to examine the amount of those earnings and the fair market value of the debentures. The outer limit of taxability in that event will be the fair market value of the property received [3] under section 115 (j) and the amount of earnings and profits of the corporation available for distribution [4] under section 115 (a). On the first subject it is conceded that the corporation had undistributed earnings as of the close of the year 1940 of $45,629.05. In addition there had been deductions from earned surplus on account of the distribution of prior nontaxable stock dividends in the amount of $111,596, which must be added to the corporate earnings available for distribution. *August Horrmann, supra.* The distribution was not made on December 31, 1940, however, but on January 26, 1941. There is no evidence whatever from which we can determine what earnings and profits were available on that date. Respondent has found them to be a figure somewhat, though slightly, less than the amount shown on the balance sheet as of the end of the current year. Under the circumstances we

---

[3] Internal Revenue Code, section 115 (j):

"(j) VALUATION OF DIVIDEND.—If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder."

[4] Internal Revenue Code, section 115 (a):

"(a) DEFINITION OF DIVIDEND.—The term 'dividend' when used in this chapter (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year) without regard to the amount of the earnings and profits at the time the distribution was made."

can not say that petitioner has sustained his burden of proving that respondent's determination was erroneous in this respect. *Dorothy Whitney Elmhirst*, 41 B. T. A. 348, 354–360.

Similarly, the fair market value of the debentures is in effect conceded to be their face amount, although petitioner contends that the common stock was thereby reduced drastically below its original basis to him. But the debentures carried interest, which has been duly met, and were a claim to corporate assets which took preference over that of the stockholders. To say nothing of petitioner's own contemporaneous gift tax valuation, the corporate assets, even at petitioner's present figure, are sufficient to justify our finding of the value of the debentures from the standpoint of collectibility upon default. Although these figures are strenuously contested by respondent, who insists that the corporate assets were of sufficient value to cover both the debentures and petitioner's original basis for the stock, we are mindful that this is not a gain or loss situation and requires no determination as to the value of the stock. *Edith B. Bass, supra*, refers to the:

\* \* \* opinions in *United States* v. *Phellis*, 257 U. S. 156, and *Rockefeller* v. *United States*, 257 U. S. 176, in which the Court had said that the test of taxability of a corporate distribution lies in its effect upon the individual stockholder rather than upon the corporation or the stockholders as a group, and it does not matter that the value of the stock on which the distribution was made was thereby decreased. The normal result of declaring a dividend of any kind is to reduce the value of stock theretofore outstanding. \* \* \*

If the debentures were worth at least as much as the corporation's earned surplus, which they undoubtedly were, respondent's determination must be sustained, and any further discussion is beyond the necessary confines of the present question. In the light of those circumstances we have found as a fact only that the fair market value of the debentures was at least as great as the dividend determined by respondent to have been received. It follows that respondent's determination must be sustained in the amount found by him.

Reviewed by the Court.

*Decision will be entered for the respondent.*

———

KERN, *J.*, dissenting: A reduction in the tax liability of a corporation may constitute a legitimate business purpose of a reorganization under the statute. *Clarence J. Schoo*, 47 B. T. A. 459. See also *C. A. Monroe*, 39 B. T. A. 685; *Tower* v. *Commissioner*, 148 Fed. (2d) 388. A reduction in the corporation's liability for dividends or interest also constitutes a legitimate business purpose. *Annis Furs, Inc.*, 2 T. C. 1096. However, the majority opinion holds that, where the reduction in the corporation's tax liability is accompanied by an increase in liability for interest in an equal or greater amount, the

reduction in tax liability can not be said to be a legitimate business purpose.

With this I am unable to agree. A realistic view of the ultimate purpose of a private corporation is that it is to make money for the investors who have contributed their capital to it, and to distribute to them as much as possible and practical out of its gross income. Under the facts of the instant case, it is apparent that after the recapitalization in question, petitioner, as an investor of the corporation, would receive a greater distribution of money in the form of dividends and interest than he received as dividends before the recapitalization. Therefore, the recapitalization contributed to the business purpose of the corporation and must be considered as a legitimate business purpose.

Since, in my opinion, the adjustments made by the corporation in its capital structure were for the purpose of accomplishing a legitimate business purpose, I am unable to conclude that the transaction was also a distribution equivalent to a dividend. See *Jacob Fisher*, 46 B. T. A. 1011.

SMITH, *J.*, agrees with this dissent.

---

ARUNDELL, *J.*, dissenting: It was my understanding that the so-called corporate reorganization provisions of the revenue acts were designed to permit some flexibility in the financial set-up of corporations without the present imposition of a tax due to such changes. It was recognized that our capitalistic economy could not properly function if it was kept in a strait jacket, as it most surely would be if a tax consequence resulted with every change in the financial structure. Thus, recapitalizations were permitted without the present recognition of tax, leaving the imposition of the tax to the time when the exchanged security should be finally disposed of. No one contends that if the recapitalization is, in fact, a fraud or a sham it is to be recognized, but I do not understand the majority would characterize what has taken place as falling within either category. Debenture bonds have taken the place of common stock and that change in capitalization was what the directors desired and that is what they accomplished. There has been a permanent change in the capital structure, and it is the receipt of these very debentures by a stockholder which, the majority hold, constitutes a taxable dividend.

But, it is said that there was no "legitimate" reason for this recapitalization. Certainly what was done was legitimate in the sense that it was lawful. Many corporations are originally organized in the same way that this corporation was "reorganized"; and, if it had been initially capitalized in the identical way that it is today, it would be

362

subject to no criticism. Surely it was never intended that the tax collector or, indeed, a member of this Court should pass on the wisdom or desirability of a corporate recapitalization. If what was done here was genuine and was not a sham, the test of the statute has been met. I think *Bass* v. *Commissioner*, 129 Fed. (2d) 300, supports the view here expressed.

SMITH, BLACK, HILL, and KERN, *JJ.*, agree with this dissent.