De Nobili Cigar Company v. Commissioner.
De Nobili Cigar Co. v. Commissioner
Docket No. 246 P.T.
United States Tax Court
1944 Tax Ct. Memo LEXIS 382; 3 T.C.M. (CCH) 83; T.C.M. (RIA) 44032; February 3, 1944
*382 Prew Savoy, Esq., for the petitioner. William V. Crosswhite, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding, under Title VII of the Revenue Act of 1936, is a review of the disallowance by respondent of petitioner's claim for refund of processing tax paid under the Agricultural Adjustment Act in the amount of $118,208.40, plus interest of $273.47, for commodities processed between October 1, 1933, and May 31, 1935, and interest on the amounts so paid. On the merits, the question involved is whether petitioner bore the burden of all or any part of the tax paid, or shifted such burden to others. There is the additional question of whether the Processing Tax Board of Review and in turn The Tax Court has jurisdiction in the case. The evidence was presented to a presiding officer designated by the Processing Tax Board. That Board, however, had made no findings nor entered any decision thereon at the time the proceeding was transferred to the jurisdiction of The Tax Court pursuant to Revenue Act of 1942, section 510. In response to an order of this Court dated January 5, 1943, to show cause why the proceeding should not be considered *383 on the record made and briefs filed before the Board, petitioner requested that an order be entered setting the proceeding for oral argument on the issues presented by the record already made. This was granted and oral argument heard on March 24, 1943. Findings of Fact 1. Petitioner, a corporation organized under the laws of New York in 1912, is located at Long Island City, New York. During the periods in question it was engaged in processing tobacco into finished products. 2. A claim for refund of processing tax was filed on June 29, 1937, and a completed claim was filed on August 28, 1937, showing presumptively that petitioner shifted the entire burden of the tax. The disallowance issued December 1, 1939, and a petition for review was filed on February 27, 1940. On May 18, 1940, it was stipulated by the parties that there was no refund due to petitioner of processing taxes paid and it was further stipulated that the Processing Tax Board of Review (hereinafter referred to as the Board) enter its order accordingly. This stipulation was filed with the Board on May 20, 1940, and on the same date it entered its decision that no refund was due petitioner with respect to its claim. *384 On August 20, 1940, petitioner filed a motion to vacate and set aside the stipulation dated May 18, 1940, and the decision of the Board dated May 20, 1940. On September 23, 1940, the Board entered an order denying the motion dated August 20, 1940, stating that "* * * the Board is of the opinion that the petitioner has not stated a valid ground for the setting aside of the stipulation filed herein * * *." On December 10, 1940, petitioner filed a second motion to set aside the stipulation of May 18, 1940, and the decision of the Board dated May 20, 1940, and for a hearing on the merits. On May 24, 1941, petitioner filed its motion for action by the Board on the motion of December 10, 1940, and one of April 23, 1941, (seeking designation of New York City as the place of hearing) and for a change in presiding member, together with an affidavit in support thereof. On August 26, 1941, the Board entered an order setting aside the stipulation of May 18, 1940, and vacating the Board's decision of May 20, 1940, and restoring the proceeding to the calendar for a hearing on the merits. The hearing on the merits was had in August, 1942. 3. During the periods involved petitioner sold 11 brands *385 of cigars and 5 brands of smoking tobacco. At least during the year 1935 it also processed and sold chewing tobacco. For the manufacture of the first above-named articles fire-cured cigar leaf tobacco and fire-cured lugs were purchased. No flue-cured tobacco was purchased. All purchases were made in southern Kentucky and Tennessee, in two ways, either in loose leaf direct from the farmer or in packed and seasoned form from dealers. The tobacco purchased from farmers, both filler and wrapper, required seasoning in petitioner's warehouse for a year and a half, while most of the tobacco purchased from dealers could be used within three or four months after purchase, although some was not sufficiently seasoned and was seasoned by petitioner for about a year. Smoking tobacco leaf usually was held only 60 days before processing. Petitioner purchased more tobacco from dealers during the tax period than from farmers. After cigars were manufactured they were held for from 9 months to a year for seasoning before sale, and they were sold on a first-in, first-out basis. Smoking tobacco, on the other hand, was sold immediately after processing. Customers for smoking tobacco and cigars coincided *386 to some extent. 4. Smoking tobacco was made for the most part from cuttings and clippings which were the by-products of cigar manufacture. These by-products, when insufficient, were supplemented by artificial clippings from low-grade leaf of the same type of fire-cured tobacco, sometimes called lugs. Petitioner advertised that its Spuntatura smoking tobacco was made from cigar clippings. In transferring cuttings and clippings from the cigar to the smoking tobacco department they were first weighed and the weight recorded in the cigar department and then transferred. Some transfers were also made from the smoking tobacco to the cigar department. 5. Prior to November, 1932, in the metropolitan area (New York City and New Jersey), petitioner sold its cigars to agents who distributed them, and in the outside area (all other states) petitioner sold to jobbers, to agents, and in some cases directly to retailers. Jobbers received discounts from list prices and agents received commissions. In November, 1932, petioner changed its method of distribution by selling direct to retailers in the metropolitan area and in all states in which it did business except the far western states and Mayland, *387 District of Columbia, Vermont, and Maine. The list price to retailers was reduced by approximately the amount of the jobbers' and agents' former discounts. Salesmen were used who received a commission, and agents and jobbers eliminated. The list prices in those areas not covered by the changed method of distribution remained the same. In October, 1933, petitioner started to return from the retail method to the wholesale method in all areas still affected by the original change, and to restore original list prices and discounts. 6. A cable, dated October 3, 1933, from petitioner's president to the company stated: "While awaiting my letter no modification organization commissions to agents only base price inside and outside territories to be changed to $37.50 for one thousand cigars 96 per dozen tobacco discount 2% cash." 7. Pursuant to these instructions petitioner on October 3, 1933, telegraphed to all its inside and outside salesmen who had not been withdrawn and who had base price lists of $34.70 less 2 percent and $.96 less 2 percent, as follows: "Beginning tomorrow fourth change prices on cigars to $3.75 for hundreds $3.80 for fifties rough two dollars and tobaccos small package *388 96 all net stop absolutely necessary to forward inventory remittance and report for sales made yesterday and today." 8. In reply to a cablegram of November 29, 1933, from petitioner's president advising an increase in the base price of all smoking tobaccos to $1, petitioner advised by cable dated December 1, 1933, in part as follows: "* * * increased price of Spuntatura [smoking tobacco] justified being in force before and still practiced now outside of regular zones stop we think it prudent not to increase price of smoking tobaccos stop other manufacturers of smoking tobaccos * * * have absorbed tax * * *." 9. On December 5, 1933, a circular was distributed to the trade in the metropolitan area stating the price of Spuntatura was increased from 96 cents to $1.00 because of the processing tax and increased costs. 10. Petitioner increased the price of both cigars and smoking tobacco in the tax period over the pre-tax period. The average increase per thousand cigars was 87 cents. The average increase per pound of smoking tobacco was $.029121765. Petitioner was cognizant of the processing tax prior to its initiation on October 1, 1933, and took steps to attempt to recoup it from *389 its customers. 11. Petitioner sold cigars, smoking tobacco, and chewing tobacco between October 1, 1933, and January 6, 1936. Its products were shipped upon order and petitioner ordinarily had no contracts for delivery of cigars over periods of several months. Invoices were priced at the price prevailing on the day of receipt of the order and most orders were filled within 48 hours. 12. The "units" processed (i.e., pounds of tobacco), the "cost" and "gross sales value" of articles processed, and the statutory (per unit) and dollar margins are as follows: Periods
Cigars
Smoking Tobacco
Total
Units Processed
Tax Period
10/1/33 - 5/31/35
2,134,792
1,836,122
3,970,914
Base Period: Pre-tax period
10/1/32 - 9/30/33
1,399,599
1,103,999
2,503,598
Post-tax period
2/1/36 - 7/31/36
607,854
510,376
1,118,230
2,007,453
1,614,375
3,621,828
Cost of Units Processed
Tax Period
$ 401,972.61
$ 196,678.77
$ 598,651.38
Tax and Interest
64,198.57
54,283.30
118,481.87
$ 466,171.18
$ 250,962.07
$ 717,133.25
Base Period: Pre-tax period
$ 299,922.88
$ 144,244.20
$ 414,167.08
Post-tax period
117,449.56
62,545.52
179,995.08
$ 417,372.44
$ 176,789.72
$ 594,162.16
Gross Sales Value of Units Processed
Tax Period
$2,734,173.33
$1,022,336.56
$3,756,509.89
Base Period: Pre-tax period
1,687,761.71
589,229.77
2,267,991.48
Post-tax period
638,905.23
279,903.93
918,809.16
$2,326,666.94
$ 869,133.70
$3,195,800.64
*390 Margins
Tax Period
Base Period
Excess Margins of Tax Period
(per unit)
(per unit)
over Base period
Per Unit
In Dollars
(Statutory)
Pre-tax
.744058910
Post-tax
.660699570
.765409837
.718321930
.047087907
$186,972.61
13. As indicated by the table, the per unit presumptive margin against petitioner is $.047087907. 14. On October 1, 1933, petitioner had on hand 60,060M finished cigars. During the tax period (October 1, 1933, to May 21, 1935) petitioner sold 68,503M cigars, (not including Condor and Whoopee, of which 175M and 174M were sold, respectively). During the same period petitioner sold 1,381M pounds of smoking tobacco. The cigars processed during the tax period, numbering 78,177M were sold during the period March, 1935, through March, 1937. The May 31, 1935, inventory of finished cigars was 69,384M on which there had been a processing tax of $56,978.17. On January 6, 1936, petitioner had on hand 42,600M finished cigars upon which $34,983.65 processing tax had been paid. 15. In selling during the tax period 68,853M cigars equal to similar products resulting from the tax-paid processing of 1,880,176, pounds of tobacco at *391 an excess margin over the base period of $.047087907 per pound, [1] petitioner recovered the tax on such cigars and in addition realized a marginal profit of not less than $88,533.55. In failing to sell during the same period 9,324M cigars upon which processing tax of $7,656.85 had been paid, petitioner failed to realize the full amount of the excess margin computed on the basis of total tobacco processed into cigars, but considering the excess profit on cigars sold, actually realized not less than $80,876.70 of marginal profit in excess of the amount of tax paid upon all cigars, sold or unsold, and thereby succeeded in shifting the burden of the entire tax and of that additional amount. 16. In selling during the tax period 68,853M cigars and 1,381,507 pounds of smoking tobacco *392 equal to similar products resulting from the tax-paid processing of 3,712,298 pounds of tobacco at an excess margin over the base period of $.04087907 per pound, petitioner recovered the tax on the cigars and smoking tobacco and in addition realized a marginal profit of $177,741.38. In failing to sell during the same period 9,324M cigars and 4,000 pounds of smoking tobacco upon which processing tax of $7,656.85 and $123.71, respectively, or a total of $7,780.56, had been paid, petitioner failed to realize the full amount of the excess margin computed on the basis of total tobacco processed, but considering the excess profit on cigars and smoking tobacco sold, actually realized $169,950.82 of marginal profit in excess of the amount of tax paid upon all cigars and smoking tobacco combined, sold or unsold, and thereby succeeded in shifting the burden of the entire tax and of that additional amount. 17. The cost of tobacco processed in the tax period was less by a difference of $.014669657 per unit than the cost of tobacco processed in the base period. Petitioner held in inventory on October 1, 1933, 2,469,070 pounds of unprocessed cigar leaf tobacco. The processing of this entire inventory *393 into cigars and smoking tobacco during the tax period would have resulted in a total of $36,220.41050 (2,469,070 X $.014669657) difference in cost attributable to pre-tax period inventory. The per-unit adjustment for excess base period commodity cost attributable to pre-tax period inventory is not in excess of $.009121429 ($36,220.41050 / 3,970,914). 18. Tobacco was sometimes held for as long as six years. It was not taken from inventory on a first-in first-out basis; tobacco of more recent years being commingled and blended with tobacco of earlier years. The tobacco put to process was charged into process on the basis of original price of the particular tobacco, and the cost of commodity processed as set out in the above margin showing is computed on that basis. 19. By March of 1935 petitioner had sold its stock of cigars on which it had paid floor stocks tax of $48,301.96, at the rate of 80 cents per thousand cigars. The processing tax paid with respect to the processing of cigars during the tax period was 82.1198 cents per thousand cigars. The processing tax for smoking tobacco was 3.0928 cents per pound. 20. In October, 1935, petitioner started to produce and sell on a larger *394 scale a low-priced cigar called "Popular" which was sold thereafter, including the post-tax period (February, 1936, through July, 1936). The Popular cigar sold in two different sizes and at two different prices. One size was one-half of an 8 1/2 inch Toscani cigar and sold for two for five cents; the other size was one-half the regular 6 1/2 inch Toscani cigar and sold at five for ten cents. In the manufacturing process the full size Toscani was made first and then cut down to the Popular size. The wage rate, however, for Popular was lower than the wage rate for Toscani. The Popular rate was 55 cents per hundred for the full-sized cigars before they were reduced to the Popular size, while the rate for the regular Toscani was 70 cents per hundred. 21. Petitioner, in the pre-tax period, distributed "free goods" in connection with the sale of its Rough Rough brand cigar. In October, 1932, in accordance with its practice of distributing "free goods," petitioner added approximately 15 percent in free cigars to each purchase of Rough Rough cigars. During the tax period some "free goods" were given with the purchase of cigars. During the post-tax period petitioner distributed "free goods" *395 in connection with the sale of its Popular brand cigar. 22. During the designated periods petitioner's monthly average operating profit, and the percentage relation of operating profit to sales, and net profit to sales, were as follows: Average Monthly
Operating Profit
Net Profit
Operating Profit
to Sales
to Sales
Pre-tax period
$32,773.19
16.75%
14.26%
Post-tax period
16,597.06
11.74%
9.95%
Base period
27,381.15
15,42%
13.11%
Tax period
30,455.68
17.39%
14.96%
23. Petitioner did not invoice the processing tax as a separate item to any of its customers. Petitioner did not pay a lower rent during the tax period nor did it change its method of packaging or wrapping. Its production methods were not changed during the tax period and there was no reduction in wage scale. Petitioner did not use a lower grade or quality of tobacco during the tax period than it had used prior thereto; nor was the quantity of raw material going into its products reduced. Petitioner had no understanding or agreement, written or oral, whereby it was relieved of the burden of the tax as such, or reimbursed therefor. 24. Petitioner did not bear the burden of any part of the *396 processing tax paid by it, but, on the contrary, shifted the entire burden thereof to others. Opinion On any basis which combines the figures for cigars and smoking tobacco or offsets the one against the other, the prima facie case resulting from application of the statutory [2] margin formula is, as petitioner concedes, unfavorable to its claim for refund of processing tax. Not only do we conclude that there is no justification for dealing with the figures independently, but an examination of the statutory language and other factors leads us to the view that the proper margin is one computed jointly on the two products. It is that principle which we have applied in setting forth our conclusion of fact as to the presumptive shift of the tax burden in finding No. 13. The statute obviously contemplates that more than one article may be processed from the same commodity. See e.g., section 907 (b) (1) referring to "the gross sales value of all articles processed by the claimant from the commodity" [Italics added]. Thus, petitioner's production of cigars and smoking tobacco from the same "commodity" would not warrant a separate margin *397 computation. This is what the major portion of petitioner's business embraced. It did, however, as occasion demanded from time to time, add to the cigar clippings which formed the major ingredient of the smoking tobacco inferior grades known as "lugs." Commodity is defined in section 913 (c) as "any commodity, prior to processing, of a type with respect to the processing of which a processing tax was imposed." Whether the cigar leaf, or its partly processed product, the clippings, and the lugs are different commodities is thus an open question. But it seems to make no difference if they are. Section 907 (b) (4) provides "Where, as for example, in the case of certain types of tobacco, the articles produced and sold by the claimant are the product of several commodities combined by him during processing, the average margins shall be established with respect to such commodities as a group, and not individually * * *." Consequently, the fact that cigar clippings and lugs were combined in petitioners' processed "article" supplies no warrant for a separate margin computation. The case of I. L. Walker Tobacco Co. v. Commissioner (C.C.A., 6th Cir.), 129 Fed. (2d) 464, *398 contains nothing to the contrary, for there the court was at pains to point out that the various grades of tobacco involved were not commingled in the completed article. It distinguished the situation "where several commodities are combined during processing. See Sec. 907 (b) (4)." Moreover, the claim for refund is a single claim. Section 907 (a). It was so treated by this petitioner and apparently is similarly regarded by respondent. Section 903 provides that "No refund shall be made or allowed * * * unless * * * a claim for refund has been filed by such person in accordance with [the] regulations * * *." The regulations require that "Such claims shall be prepared in accordance with the instructions contained on the forms." Article 201. One of the instructions on the forms is - * * * the claimant is required to make a showing with respect to margins as part of his claim. Another is as follows: 3. Separate claim with respect to each commodity processed. A separate claim on P. T. Form 79 shall be filed with respect to each commodity on the processing of which the claimant paid processing tax. In the case of tobacco, all market classifications of tobacco shall be considered *399 a single commodity and, therefore, there shall be included in one claim all of the market classifications of tobacco on the processing of which the claimant paid processing tax. Only one claim shall be filed by any person with respect to the total amount paid by such person as processing tax on the processing of the particular commodity (or of all market classifications of tobacco) covered by the claim. Since, as we have seen, these regulations are a reasonable application of the provisions of the statute, there seems no basis for considering the computation of separate margins on the two processed articles. It follows that presumptively petitioner shifted the entire burden of the tax and in addition was the beneficiary of excess tax period profit of nearly five cents on each processed pound of tobacco, amounting in all to approximately $187,000. Numerous attempts are made to rebut the statutory presumption, as permitted by section 907 (e), or to justify adjustments in the margin computations. Some may be disposed of summarily. In dealing with figures representing gross sales value we have deducted commissions and discount. This eliminates the rebuttal argument that certain variations *400 in petitioner's business practice require adjustment of any gross sales value derived purely from the book sales figure. In dealing with amounts representing clippings the parties disagree whether their value should be deducted from the cost of the cigar tobacco or added to its gross sales value. Petitioner recognizes that "the result is not changed regardless of the method approved by this Board," and in any event, in the view we have taken, this question becomes irrelevant. And respondent included in the processing tax paid a small interest item which petitioner concedes will not affect the result. The figures we have incorporated in our finding No. 12, as the basis for the computation of the presumptive margain are in the main those proposed by respondent. They are derived from petitioner's books and records kept in the ordinary course of its business. No satisfactory reason has been advanced why they should be disregarded. The accuracy of the figures themselves is not challenged. "If, on the other hand, the Board accepts the method of computation of Respondent, Petitioner will not dispute the accuracy of Respondent's computations." (Petitioner's brief.) One controversy in this *401 field, however, deserves notice. In computing the cost of commodities included in the smoking tobacco petitioner's books carry the clippings resulting from the cigar manufacturer but ultimately processed into smoking tobacco at the original tobacco cost. Petitioner contends that this cost should be reduced to coincide with the purchase price of the lugs or inferior tobacco bought on the open market. We do not regard the contention as sound and have employed the book figures not only because petitioner itself adopted them in the maintenance of its own records but because it seems evident that the lugs were not a comparable article and no other evidence of a proper price appears. [3] Petitioner advised its customers that "Spuntatura [smoking tobacco] is from cigar cuttings and clippings." It could not have furnished an equivalent product by purchasing the grade of tobacco represented by the lugs. The fact that comparable figures are used for all three periods makes it even more difficult to believe that an adjustment of these book figures is required to accord with the true facts. *402 Petitioner has submitted elaborate calculations tending to show that by a method to which it refers as "actual realization" it can be demonstrated that the processed articles were actually sold for prices lower than those prevailing in the pre-tax period and, hence, that the burden of the tax could not have been shifted. Without discussing in detail the various aspects of these figures we think it sufficient to say that assuming they support the factual result they are still of no probative value. This is particularly true where a business trend may be due to imponderable factors. See De Nobili Cigar Co., 1 T.C. 673, particularly 675, 676. The statute, it is true, permits the introduction of any evidence which will rebut the prima facie case and show that petitioner absorbed the tax. But it is so evident that a processor could sell articles like those processed during the tax period at greatly increased prices and thereby pass on the tax "in any manner whatsoever" that it seems hardly necessary to emphasize the irrelevance of petitioner's fundamental position. See Lee Rubber & Tire Corp. v. United States (Dist. Ct.,E.D. Pa.), 49 Fed. Supp. 6. *403 It had a large inventory at the beginning of the tax period and if the sales during the tax period were from that inventory, the higher prices so received would be no less available to offset the processing tax than would be the case if the sales applied to the processed articles themselves. Section 907 (e) (2). This seems to us to be the essence of the statutory computation. Petitioner's argument is a confession but not an avoidance of that principle. It is as though it were to say in effect, "We did receive higher prices for articles produced and sold by us, but these were not the articles upon which the processing tax was paid." Similarly, petitioner's approach disregards other elements by which the tax might have been passed back or to the side. A comparison limited to selling prices in the two periods and taking no account of commodity costs and other expenses is not only a variant from the statutory formula but limits the basic considerations as well. But if the amount of the processing tax was thereby recovered, that circumstance has no tendency to rebut the presumption that by means of the higher prices or other factors an amount equivalent to the tax was passed on "in any *404 manner whatsoever." There are, however, two collateral aspects in which from a possibly equitable standpoint such an argument might under appropriate circumstances have a certain appeal. The first is that a consideration of the statutory formula makes apparent the underlying assumption that the number of articles processed and tax-paid, or their equivalent, would be sold at the tax-period prices. Gross sales value is computed by applying the sales price current not to the number of articles actually sold but to those processed. Thus, if there were a radical decrease in the number, of articles sold below those processed, it might be contended that the total tax paid was never recovered because of insufficient sales at the high taxperiod price. But it seems apparent that this would be so only if the volume of sales fell so far below the volume of production that the tax recovered in the sales, added to the excess profit, was still insufficient to equal the total tax paid. The present facts do not warrant such a conclusion and certainly petitioner, upon whom rested the burden, has failed in any such demonstration. The smoking tobacco was sold at about the time of production and, as *405 petitioner concedes, it may be eliminated from this discussion. The relation of cigars processed upon which the tax was paid to the number actually sold [4] is roughly 78,000 to 69,000. The processing tax was approximately 82 cents a thousand on the roughly 9,000 cigars which thus appear to have been processed but unsold. On the other hand, the cigars sold represented about 1,880,000 pounds of tobacco put into process, upon each pound of which petitioner presumptively realized not only the full amount of tax paid thereon, but an additional profit of 4.7 cents per pound. This is evidently more than sufficient for it to recoup the presumptively recovered but actually unrealized margin representing the tax on the unsold cigars, as appears more specifically from our findings Nos. 15 and 16. See Colonial Milling Co. v. Commissioner ( C.C.A., 6th Cir.), 132 Fed. (2d) 505, certiorari denied, 318 U.S. 780. *406 The second consideration is the impact of the floor-stocks tax. That amount, some $48,000, was paid on petitioner's inventory as it stood at the beginning of the tax period. An argument could consequently be made that out of the cigars sold during the tax period there must have been recouped not only the processing tax paid during that period but also the floor-stocks tax if it is to be concluded that petitioner actually recovered from the increased tax period prices on actual sales all of the taxes paid of both types. In this case, however, it is apparent that the excess profit realized on cigars actually sold is even large enough to cover the floor-stocks tax. We find it unnecessary, therefore, to consider whether petitioner's failure to obtain a refund of the floor-stocks tax in De Nobili v. United States, ( Dist. Ct., N. Y., E.D.), - Fed. Supp. - (February 24, 1943), was the result of an affirmative conclusion by the court that petitioner had passed that tax on or merely, as the opinion states, that "the sole issue presented at the trial was whether the plaintiff had borne the burden of proof necessary to support a recovery. I do not think that it has done so." An even more *407 difficult question involves the doubt whether in providing for separate methods to recover the two taxes, Revenue Act of 1936, sections 905 and 906, Congress intended that either one should be considered in disposing of a claim for refund of the other. But we need not here decide whether the equitable principles supporting the discussion in the preceding paragraphs are valid or appropriate for our consideration. See Commissioner v. Gooch Milling & Elevator Co., 320 U.S. 418. We say only that even if in suitable circumstances they could be taken into account, no facts appear from the present record justifying their application. If the discussion is relevant here at all, it has the sole effect of suggesting that the result reached on other grounds is not inequitable. Petitioner insists that certain other adjustments are required in the margin computation to make it accord with its particular situation. It contends that the sale of a new low-priced cigar in the six months after the tax requires an increase in the gross sales value for that period. Epstein v. Helvering ( C.C.A., 4th Cir.), 120 Fed. (2d) 427. The record, *408 however, is barren of the facts from which that adjustment can be computed. The manufactures did not commence in 1936, the post-tax year, as in the Epstein case, nor even in October, 1935. Some were apparently produced in 1933 and 1934, according to the testimony of petitioner's assistant general manager. It is not clear when they first went on sale, nor that they did not take the place of another cigar of the same specifications but with a different name, and the post-tax period sales do not show an increase in volume, as in the Epstein case. Suffice it to say that we cannot tell to what extent the tax period is comparable, and to what extent it is not, whether any adjustment is called for, or what the proper amount of the adjustment should be. The figure used by petitioner is unsupported and we cannot accept it without better evidence of its propriety. A similar comment must be made as to the contention that petitioner's practice of giving away supplementary "free goods" to stimulate sales were so different in the post-tax period as to require attention. There is considerable evidence that no change actually took place. At least the basis for a specific finding as to the *409 amount of adjustment required is lacking. But in any event we cannot subscribe to petitioner's theory on this subject. The delivery of additional merchandise without additional charge could only have the effect of reducing the per unit price of the entire sale. Since it is petitioners' own position that these indirect methods of reducing prices took place only in the post-tax period or at most only in the base period, the result is to decrease the per unit recovery in the base period and thereby as compared with the increased prices of the tax period to increase the margin unfavorable to petitioner. We cannot regard this as a justification for any alteration in petitioner's favor. Another claimed adjustment is on the ground of lower tax-period cost of processed tobacco. E. Regensburg & Sons v. Helvering ( C.C.A., 2d Cir.), 130 Fed. (2d) 507. There may be merit to this contention up to the amount of petitioner's pre-tax inventory which is all that the Regensburg case dealt with. The allowance of any refund to the extent that the taxpayer failed to bear the burden of the tax "through reduction of the price paid for any such commodity" is expressly *410 forbidden by Revenue Act of 1936, section 902 (a)(2). Where, as in the Regensburg case, a taxpayer can demonstrate that his increased margin in the tax period resulted from a decrease in the "cost of the raw material * * * during the 'tax period'" and "was not 'due' to the tax," he may be entitled to a corresponding adjustment. But in that case all of the raw material processed during the tax period was purchased before it commenced and was in the taxpayer's inventory when that period opened. Such proof makes it possible to infer that the tax which was not in existence when the tobacco was purchased could not have been passed back to the producer. This, however, is manifestly untrue of tobacco purchased during the tax period. Petitioner has the burden of proof and must furnish the material from which it is possible to dispel inferences unfavorable to it. Certainly the theory of the refund sections, and particularly section 902(a)(2), supra, assumes that prices of commodities bought after the tax became effective could have been fixed with knowledge of the economic factors resulting from the tax and the correlative benefit payments. It does not presuppose as an impossibility *411 nor even as an improbability that purchases made at lower prices during the tax period were the result of the tax and had the effect of offsetting it. There is no persuasive evidence in the present record that the decrease in price was unconnected with the tax, even assuming that this could ever be shown. See C. M. McClung & Co. v. United States ( Ct. Cls.), 35 Fed. Supp. 464. Maintenance of the same purchasing methods and purchases at market price constitute no such proof, for, regardless of the reasons, the effect may be to pass the tax back just as it is passed forward where increased sale prices are made possible by a rise in the general market. Honorbilt Products, Inc. v. Commissioner ( C.C.A., 3rd Cir.), 119 Fed. (2d) 797. We conclude that if petitioner is entitled to an adjustment for this item, it must be limited to the amount attributable to its pre-tax period inventory. This is the basis for the conclusion on this subject set forth in our finding No. 17. Even that conclusion is subject to the infirmity that there is no direct proof that all of the pre-tax inventory was processed in the tax period. The resulting *412 figure, however, is far too small to overcome the per unit adverse margin which we have found to be the result of the application of the statutory formula, and, since this is the only adjustment which in our view petitioner can plausibly support, the ultimate result is the same whether it is applied in reduction of the statutory margin or not. The conclusions reached are teinforced by the circumstance that there was an evident effort on petitioner's part to adjust selling prices to offset the tax. Before the end of 1933, for example, in a circular announcing to distributors that a new price list was to be put in effect, petitioner sought to "justify" its action on the ground that "We are compelled to make these changes on account of the new processing tax and of the increased cost of material." Such factors may not be conclusive and we do not to any extent rest the present result upon them. But see Revenue Act of 1936, section 907 (e)(2). We note them only as an indication that the conclusion otherwise arrived at is not unreasonable. See Commissioner v. Bain Peanut Co. of Texas ( C.C.A. 5th Cir.), 134 Fed. (2d) 853; United States v. Poindexter & Sons Merchandise Co. ( C.C.A., 8th Cir.), 128 Fed. (2d) 992; *413 Colonial Milling Co. v. Commissioner, supra. In this posture of the case it may seem useless to deal with the question of jurisdiction which respondent has raised. But it is an issue which goes to the essence of any proceeding and must be disposed of. We are of the opinion that jurisdiction exists. The issue is whether the Processing Tax Board still retained jurisdiction of this proceeding upon the effective date of the transfer of these cases to this Court, so that it in turn could assume that jurisdiction. Within three months, the time to petition for review, after the Processing Tax Board had entered its decision on the basis of a stipulation of the parties that no refund was due, petitioner moved to set the decision aside on the ground of inadvertence and mistake. On the same day the Processing Tax Board entertained the motion and recorded that action by service upon the adverse party and designation of the time and place for argument thereon. This procedure sufficiently distinguishes Denholm & McKay Co. v. Commissioner ( C.C.A., 1st Cir.), 132 Fed. (2d) 243, where the court said: "* * * We think the Board must *414 take some recorded action on the untimely motion before the expiration of the three months' period for court review; otherwise the Board's decision becomes 'final' and beyond the power of the Board to reopen." Petitioner's motion was denied but the filing of a "timely" motion to vacate within the period allowed for appeal suspended the time for filing any petition for review of the original decision and its denial initiated a new three-month period for that review. Burnet v. Lexington Ice & Coal Co. ( C.C.A., 4th Cir.), 62 Fed. (2d) 906; cf. Smith v. Commissioner ( C.C.A., 4th Cir.), 67 Fed. (2d) 167. Since the Board as a whole acted to entertain the motion, the case is not governed by Commissioner v. Realty Operators, Inc. ( C.C.A., 5th Cir.), 118 Fed. (2d) 286, where the court said: "* * * If it be conceded that the Board, because it may change its rules, could waive the enforcement of Rule 40 [limiting the time to move for rehearing to 30 days] in a particular case, one member, though he constitute a division for the despatch of business, cannot do so." The original decision did not become *415 final until the expiration of the period allowed for filing a petition for review. Revenue Act of 1936, section 906(g) and Internal Revenue Code, section 1140 (a). Accordingly, the denial of the motion to vacate on September 23, 1940, postponed the finality of the original decision until December 23rd of that year. Before that date a new motion to set aside the stipulation and decision and to grant a hearing on the merits was made and entertained. Like the earlier one that motion suspended the time for filing a petition for review while it was under consideration and, consequently, the subsequent favorable action of the Processing Tax Board thereon dealt with a matter still within their jurisdiction and entitled petitioner to the relief ultimately granted and to the trial on the merits which the Board ultimately allowed. There is much disagreement whether petitioner's motions were made under the Board's Rule 27, entitled "Motions for Rehearing," or under its Rule 12, entitled "Motions Generally." The former are limited to a 45-day period; the latter are required merely to "be timely." Since the rules were drawn by the Board and applied by it in the regular course of its business, *416 and since it evidently regarded the motion as one made under Rule 12, we are not disposed to reach a contrary conclusion. And see Garden City Feeder Co. v. Commissioner (C.C.A., 8th Cir.), 75 Fed. (2d) 804, 806. And in the absence of some other limitation, both motions were clearly timely. See Federal Rules of Civil Procedure, Rule 60 (b). St. Louis Mutual Life Insurance Co., 30 B.T.A. 1319. We are for these reasons persuaded that the Board's original decision never became final; that it was effectively vacated by the Board; and that the Board accordingly retained jurisdiction of the proceeding throughout the hearing on the merits and until its jurisdiction was transferred to this Court. It is hence not for lack of jurisdiction but on the merits that, Decision will be entered for respondent. Footnotes
1. This combined cigar and smoking-tobacco figure is unduly favorable to petitioner (see finding No. 16, following). Even if that margin is first diminished by the adjustment referred to in our finding No. 17, the per unit figure will be.03796647, the realized marginal profit on cigars sold will be not less than $71,383.66, and the amount of excess margin actually realized will be not less than $63,726.81.↩
2. Revenue Act of 1936, Title VII.↩
3. Petitioner takes the position in its brief that - "It is impossible for this petitioner to determine the actual cost of cuttings and scrap which are transferred from the cigar factor to the smoking tobacco ↩ factory.
4. In petitioner's "tax period," which ended in May, 1935, only because no further tax was paid by it. From May through December the processing tax continued in effect accompanied by the presumptive high tax period selling price. Figures presented by petitioner indicate that its prices did not begin to break at least until November, 1935. During the seven months through December petitioner sold approximately 26,000M additional cigars and even through October it sold 20,000M additional, sufficient to more than equal the deficit in cigars sold during the tax period. Since, however, we have no margin computation for the interval, we have omitted it entirely from consideration.↩