CARLTON B. OVERTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE W. OLIPHANT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6226, 6231. Promulgated February 28, 1946.

*Harold H. Bowman, Esq.*, for the petitioners.
*Bernard J. Long, Esq.*, for the respondent.

306

308

OPINION.

DISNEY, *Judge*: The chief questions are whether petitioner Overton is liable in 1936 and 1937 for gift taxes and petitioner Oliphant in 1941 for income tax on dividends paid in those years to their respective wives on class B stock of the corporation.

The petitioners admit that the reclassification of stock of the corporation, the replacement of preferred stock by debenture bonds carrying the same rate of interest as the dividends paid on the replaced stock, and the transfers by stockholders to their wives of class B stock received, with class A stock, in exchange for old common stock, were made for the purpose of reducing income taxes to a legal minimum, and contend that, regardless of such purpose and other considerations bearing on the question, the transfers of class B stock to their respective wives were bona fide gifts of the securities, and, consequently, they, as donors, should not be regarded as the owners of the stock in the taxable years for tax purposes. The position of the respondent upon brief is that the transfers of class B stock by petitioners to their respective wives were not bona fide gifts, but a plan to distribute income of petitioners under the guise of dividends paid directly to their wives.

The fundamental difference between the parties is whether the transactions, in the light of all of the evidence, were real, such as the law permits for reducing tax liability, or a sham, and therefore ineffective for tax purposes.

Numerous cases illustrate the rule that strict compliance with the letter of the statute may not be effective for tax reduction purposes on account of being contrary to the intent of Congress. In *Gregory* v. *Helvering*, 293 U. S. 465, the plan of reorganization followed the pattern set by the statute, but tax relief was denied upon the ground that the plan had no relation to the business of the corporation involved in the transaction. The Court said:

* * * The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

Neither is legal title to the property from which the income was derived the sole governing factor. *Lucas* v. *Earl*, 281 U. S. 111.

To the same general import are *Griffiths* v. *Helvering*, 308 U. S. 355; *Higgins* v. *Smith*, 308 U. S. 473; and *Commissioner* v. *Court Holding Co.*, 324 U. S. 331. See also *Alice H. Bagley*, 4 T. C. 897, where the form of the transaction constituted a recapitalization under the reorganization provisions of the governing statute, but the exchange of common stock for new common stock and debenture bonds of the corporation lacked a business purpose and was essentially equivalent to the distribution of a taxable dividend; also *Adam A. Adams*, 5 T. C. 351, a similar case.

The corporation is not before us in these proceedings and it is not necessary to decide whether it passed through a statutory reorganization. However, the plan adopted and followed by it with the

knowledge and consent of its stockholders constitutes material evidence on the question at issue and may not be ignored. Without it, petitioners and the other stockholders could not have consummated the plan they devised for reducing their tax liability.

The stockholders considered a plan to increase the number of shares of common stock in order to provide stock of a lower value for gifts to their wives. Such a plan would have given the wives stock control and dividend rights on a basis equal to their own, rights the stockholders finally concluded to avoid conferring on account of a determination that they, as administrators of the business, were entitled to all of the first profits available for dividends and did not wish to have the women voting on current management matters. The plan put into effect, however, placed greater restrictions upon the class B common stock created for the express purpose of transferring it to the wives of the old stockholders for tax avoidance purposes.

One of these restrictions was the limitation in the stock certificates of the right to participate in distributions of the corporation's capital to $1 a share. No contention is made that this nominal figure has any relation to the value the stock would have had at that time if the class B stock had been authorized to participate in capital distributions on an equality with class A stock, which was retained by the old stockholders. It is evident that the amount is an arbitrary figure. This restriction enabled the old common stockholders to retain all of their interest in the corporation's assets, except $1,000, the dissolution value of the class B stock, and gave petitioners a basis they regarded as plausible to contend that the class B stock did not have a value greater than $1 a share for gift tax purposes. Without, however, transferring greater interest in corporate assets, ownership of the stock conferred upon the transferees rights to participate in dividends grossly disproportionate to the dissolution value of their stock. These rights, conferred upon stock otherwise lacking more than nominal value, had great potential earning power, and such benefits, without tax liability to the petitioner (as intended), constituted the substance of the transfers, rather than the liquidation value of the stock. The object was part of the general plan to divide corporate earnings among family units with a corresponding reduction in tax liability of the heads of the units. This is definitely shown by testimony in the record.

Petitioner Overton, after pointing out that the corporation was emerging from a period of high profits and that the officers believed that it might be entering a period of low earnings, testified:

* * * Therefore, we felt that when the income from the common stock in addition to our salaries reached a certain figure, that it would be good business on our part to let our wives have an additional income during that period of our lives when we can see how they handle money. * * *

This testimony was followed by a remark of the witness that he was speaking only for himself. The success of the plan to distribute earnings among B stockholders having practically no capital at stake in the business is shown by dividend payments made in and after 1936.

After June 10 in 1936 the class B stock earned $60 a share, in comparison with $15 on class A stock. Of the class B dividends so paid, $28 a share was paid on June 18, a date only 8 days after the stock was transferred by the A stockholders to their wives. Less dividends were paid in subsequent years, yet the ratio of 1 to 4, after deducting the $10 a share payable on class A stock before dividends on class B, was maintained. For the 6-year period ended in 1941 (dividends were not paid in 1939) the dividends on class B stock aggregated $150.40 a share, an average of $25 a year, and on class A stock $77.60, including the preferential dividend of $10 a share except in 1936, an average of $13 a share. Thus the class B stockholders, with no capital investment, over a period of 6 years received more than twice the amount of dividends paid to the A stockholders, who alone had capital at risk in the business. The amount payable on the class B stock was regarded as the excess of what the officers of the corporation should receive as salary for administering the business and a fair return on their investment in class A stock. The class B stock, under the circumstances, was in the nature of a device for assignment of future income.

The control retained by the old stockholders was substantial. The respondent argues that the voting control was complete, contrary to contentions of petitioners that class B stock had voting privileges in proceedings for mortgaging the property and franchises of the corporation, for guaranteeing bonds of another corporation, for sale of the franchises and property, or establishing priorities or creating preferences between classes of stock, for consolidation, for voluntary dissolution, or for a change of name, each privilege under a specified provision of the Stock Corporation Law of New York, pursuant to section 51 of such law.

It is unnecessary to resolve the difference of the parties on this point. The class A stock was intended to, and it is not denied that it did, have exclusive voting rights as to general routine matters for conducting the affairs of the corporation, including the selection of directors. The owners of all except 62 shares of the old common stock were the directors and officers of the corporation for some years prior to the reclassification of its stock and were its officers at least for the remainder of 1936. The matters on which the class B stockholders had a right to vote, according to the contentions of petitioners, were extraordinary, and therefore unlikely to arise for a vote of stockholders.

Limitations were placed upon the ownership and enjoyment of the stock by the agreement of April 8, 1937, among petitioners and Frank

C. Overton and Abner Koplik, owners of 93.8 per centum of the class A stock, and their wives. The general purpose of the agreement was to keep the stock and bonds among the family groups and their survivors by purchase at artificial prices. For instance, holders of A stock had an option to acquire, upon the happening of specified contingencies, bonds in excess of $10,000 and A stock. B stockholders had the same right as to the B stock, and, in the event of disposition of stock or bonds contrary to the terms of the agreement, nondefaulting A stockholders were entitled to the interest and dividends on such securities upon demand. The B stockholders could not, without the consent of all other stockholders, receive more than $1 a share for the stock, and a wife was required to sell her stock at that price upon the death of her husband.

This restrictive agreement was entered into after the transactions of June 10, 1936, and is therefore not controlling. Nevertheless, it is, in our view, corroborative, for it demonstrates the willingness of the wives unhesitatingly to give up valuable rights without consideration, even in the face of prior receipt of large dividend payments.

*Marshall* v. *Commissioner*, 57 Fed. (2d) 633, and other cases involving similar facts, cited by the petitioners to support their view that the transfers of class B stock to their wives constituted bona fide gifts and should be recognized as such, are distinguishable on their facts and for that reason do not control the question here. Considering the control and interest retained by petitioners in connection with the transactions, and other evidence bearing upon the question at issue, we are of the opinion, and hold, that the substance of the plan was a device to distribute, in the guise of dividends, income earned by class A stock retained and owned by the petitioners.

We therefore hold that the petitioner Carlton B. Overton made gifts to his wife in each of the years 1936 and 1937, in the amount of the income from the class B stock in her name; and that the income in 1941 from the class B stock, in the name of the wife of George W. Oliphant, was his income.

Petitioner Overton does not question the applicability of the gift tax provisions of the statute, or section 3612 (d) (1) of the code respecting the penalty imposed for failure to file gift tax returns under the conclusion reached by us. Accordingly,

*Decisions will be entered for the respondent.*