C. E. Hightower v. Commissioner.
Hightower v. Commissioner
Docket No. 16440.
United States Tax Court
1949 Tax Ct. Memo LEXIS 32; 8 T.C.M. (CCH) 1003; T.C.M. (RIA) 49273; November 18, 1949
*32 Sam G. Winstead, Esq., Republic Bank Bldg., Dallas, Tex., for the petitioner. Donald P. Chehock, Esq., and Allen T. Akin, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies in income tax, declared value excess-profits tax, and excess profits tax for the fiscal years ending July 31, 1944, and July 31, 1945, as follows: Deficiencies
Year
Declared
Excess
Ended
Value Excess-
Profits
July 31
Income Tax
Profits Tax
Tax
1944
$ 813.26
$12,901.68
1945
$2,049.13
278.40
5,955.58
Totals
$2,049.13
$1,091.66
$18,857.26 The deficiencies, here in question, were determined against petitioner under section 311 of the Internal Revenue Code, as transferee of the assets of Goodie-Goodie Restaurant, Inc., and the Midway Liquor Company, Inc., both of Dallas, Texas. The requisites of transferee liability are conceded by petitioner. The issues for our determination are: (1) Whether the Midway Liquor Co., Inc., was entitled to a deduction for rental expenses in excess of $3,600 for each of the fiscal years ending July 31, 1944, and July 31, 1945; (2) whether the Midway Liquor Co., Inc., was entitled to a deduction for legal and professional expense in excess *33 of $440 for the fiscal year ending July 31, 1945. The case was submitted on a stipulation of facts, oral and documentary evidence. The facts as stipulated are so found. Such part thereof as it is considered necessary to set forth is included with other facts found from evidence adduced in our Findings of Fact Petitioner is an individual and at the time of the hearing of this case resided in the city of Dallas, Texas. The Goodie-Goodie Restaurant, Inc., (referred to hereinafter sometimes as Goodie) of Dallas, Texas, was organized July 17, 1937. From the date of organization until the dissolution of the corporation on July 31, 1945, all of the stock of the company was owned by petitioner. The Midway Liquor Company, Inc., (referred to hereinafter sometimes as Midway) a retail liquor store, of Dallas, Texas, was organized on August 28, 1937, with an authorized capital stock of $3,000. During the years 1943, 1944, and until the dissolution of the corporation on July 31, 1945, all of the stock of Midway was owned by Goodie. Prior to 1943, petitioner, individually, owned all the stock of Midway. Upon the dissolution of the two corporations, on July 31, 1945, the petitioner received all the *34 assets, which assets in each corporation were of a value in excess of the deficiencies herein asserted. All tax returns of petitioner, Goodie, and Midway for the taxable years, here involved, were filed with the collector of internal revenue, second district of Texas, at Dallas. During 1937, petitioner rented for Goodie 3.43 acres of land on the corner of Cadiz Street and Industrial Boulevard, Dallas Texas, on a five-year lease, at $150 rent per month, with an option to purchase or rent for an additional five years. The option was exercised on April 30, 1941, and the land was purchased for $36,500. The land was located in the area between the downtown business district of Dallas and the business and residential district of Dallas known as Oak Cliff. The building, fixtures and equipment erected on the land cost Goodie approximately $80,000. The entire building was approximately 80 feet by 150 feet, or 12,000 square feet. All the building was used for the Goodie restaurant except a space on the ground floor, about 20 feet by 20 feet, and 10 feet by 15 feet in the basement, or a total of 550 square feet, which was used by Midway Liquor Store. Midway had about $3,000 worth of fixtures *35 in its part of the building. The operating of Midway was orginally intended as an additional service to the patrons of Goodie. Midway remained here until it moved to its present location on July 31, 1940. Federal income tax returns for Midway, for the fiscal years indicated, show the following: Sept. 1937 to
Aug. 1, 1938 to
Aug. 1, 1939 to
July 31, 1938
July 31, 1939
July 31, 1940
Sales
$40,463.07
$41,200.24
$49,331.46
Profit before rent ex-
pense and income
taxes
3,833.49
4,084.06
6,346.02
Rent expense
4,046.36
4,120.06
4,627.02
Net profit or (loss)
before taxes
(212.87)
(36.00)
1,719.00
Aug. 1,1940 to
Aug. 1, 1941 to
Aug. 1, 1942 to
July 31, 1941
July 31, 1942
July 31, 1943
Sales
$87,245.80
$92,916.06
$145,934.40
Profit before rent ex-
pense and income
taxes
11,327.91
14,602.69
28,335.08
Rent expense
8,724.58
9,291.61
14,593.45
Net profit or (loss)
before taxes
2,603.33
5,311.08
13,741.63
Aug. 1, 1943 to
Aug. 1, 1944 to
July 31, 1944
July 31, 1945
Sales
$182,370.01
$164,968.58
Profit before rent ex-
pense and income
taxes
34,698.56
20,830.64
Rent expense
18,236.99
16,495.01
Net profit or (loss)
before taxes
16,461.57
4,335.63
From the date of its organization in 1937, through the fiscal year ending July 31, 1943, Goodie continuously reported net *36 losses each year on its income tax returns. Goodie reported profit before taxes for the fiscal years ending July 31, 1944, and July 31, 1945, in the amounts of $6,429.21 and $20,096.20, respectively. (The amount reported for the fiscal year ending July 31, 1945, included $14,355.75 long-term capital gain). Neither Goodie nor Midway reported payment of any dividends in any year of their existence from 1937 to 1945. The joint occupancy of the Goodie Restaurant and the Midway Liquor Store in Goodie's building terminated in 1940, when it was found the liquor store was located in dry territory. Under date of June 28, 1940, petitioner made a lease with the Rock Island Railroad, subject to termination on 30 days written notice, on some land on Cadiz Street, about 700 or 800 feet northeast of the Goodie Restaurant. The land rented was approximately 100 by 100 feet, and the written lease called for monthly rental of $27 per month. The building housing the Midway Liquor Store was constructed on the railroad property in 1940. The cost of the building and improvements was $5,229.53, which was paid by Midway. On September 30, 1940, Midway was given credit for the $5,229.53, as an offset on the *37 10 per cent of gross sales, rental payments, paid to petitioner for the use of the premises. Petitioner and the Rock Island Railroad entered into a new lease under date of June 25, 1941, in which 13.6 acres of land was added to the 100 by 100 feet previously rented by the petitioner and the rent was increased to $89.50 per month. This lease was also subject to termination on 30 days written notice. Under date of November 30, 1942, this lease was assigned in writing to Goodie for and in consideration of $2,614.77. (Payment was in the form of a promissory note, executed by Goodie, payable upon demand.) Later, on July 31, 1944, another note was given by Goodie to petitioner for $1,656.01, when a revenue agent disallowed some of the depreciation claimed and increased the depreciated book value of the Midway building from $2,614.77 to $4,270.78. At the time of the assignment of this lease, Goodie was indebted to petitioner in an amount of over $100,000. On November 30, 1942, petitioner and the Cadiz Realty Company entered into a lease covering the premises above described. This lease was entered into because the Cadiz Realty Company had been organized by the Rock Island Railroad and the *38 real estate in question had been transferred to the realty company. Midway claimed depreciation in the amount of $140.52 on both of its tax returns filed for the taxable years here in question. Schedule J of the returns indicates that the claim was calculated on the basis of $1,404.75, fixtures and equipment. The Internal Revenue Agent in Charge examined Midway's tax return for the fiscal year 1941, and the only adjustment was the disallowance of certain travel expense in the amount of $2,600. Midway's 1942 and 1943 returns were accepted as filed, without examination. Some types of business in Dallas, other than liquor, operate in some instances on the percentage lease basis. The following schedule shows the gross sales, gross profit, rent paid and net profit of Midway, along with other liquor establishments in Dallas: 1943
Name of Liquor Establishment
Gross Sales
Gross Profit
Rent Paid
Net Profit
Midway Liquor Co. Inc. (Fiscal year ending
July 31)
$145,934.40
$ 40,190.80
$14,593.45
$13,741.63
Odom Liquor Corinth St. Store
76,445.97
21,063.04
480.00
15,670.90
Odom Liquor Second Ave. Store
58,743.34
15,630.22
900.00
3,223.22
Buck & Ruck
97,879.87
1,200.00
Centennial Liquor Store No. 1
330,499.38
63,764.48
3,000.00
34,120.10
Centennial Liquor Store No. 2
449,425.14
107,606.72
2,700.00
72,369.42
Centennial Liquor Store No. 3
166,604.77
41,827.67
1,560.00
18,200.36
Centennial Liquor Store No. 4
154,185.36
37,766.82
900.00
17,339.85
Ace Liquor Stores (Total of five stores)
422,714.12
96,082.87
5,825.00
69,568.58
1944
Midway Liquor Co. Inc. (Fiscal year ending
July 31)
$182,370.01
$ 46,637.27
$18,236.99
$16,461.57
Odom Liquor Corinth St. Store
79,825.51
19,136.90
480.00
15,382.52
Odom Liquor Second Ave. Store
75,577.04
15,082.54
900.00
4,463.21
Buck & Ruck
145,760.82
1,200.00
Centennial Liquor Store No. 1
463,148.10
96,585.05
3,000.00
64,642.89
Centennial Liquor Store No. 2
452,836.28
96,789.45
3,000.00
60,928.13
Centennial Liquor Store No. 3
211,396.99
47,286.20
1,560.00
19,555.77
Centennial Liquor Store No. 4
214,091.34
47,214.05
900.00
22,740.76
Ace Liquor Stores (Total of five stores)
561,407.93
112,739.71
6,030.00
71,758.01
1945
Midway Liquor Co. Inc. (Fiscal year ending
July 31)
$164,968.58
$ 34,170.47
$16,495.01
$ 4,335.63
Odom Liquor Stores, one on Corinth Street,
the other on Second Avenue *
161,327.36
26,145.69
1,450.00
14,924.92
Buck & Ruck
116,250.97
1,200.00
Centennial Liquor Store No. 1
355,764.76
71,472.50
3,200.00
34,153.06
Centennial Liquor Store No. 2
374,947.87
75,943.16
3,900.00
40,014.61
Centennial Liquor Store No. 3
182,426.97
37,389.59
1,560.00
10,315.85
Centennial Liquor Store No. 4
230,299.33
46,263.34
1,050.00
18,859.73
Ace Liquor Stores (Total of five stores)
519,543.01
111,807.57
6,915.00
67,220.54
*39 One of Odom's liquor stores was located on Corinth Street, about a half or three-fourths mile east of Midway. Both Midway and Odom's have about the same type of structure and are approximately the same size. Both have similar locations with reference to Oak Cliff, both being a short distance from a viaduct used as a thoroughfare between Oak Cliff and the rest of the city. Odom's store was located on three and one-half acres of land which Odom's mother bought in 1941 for $6,500. The rental arrangement between Odom and his mother was "all a mother and son relationship." The other Odom Liquor Store was located on Second Avenue, in a shopping district. Buck and Ruck's Liquor Store was located on the corner of Record and Jackson Streets and was one block from the county courthouse, one block from a hotel, one block from the post office annex and one and a half blocks from the union depot; it was on the ground floor of a two-story brick building; it was the first liquor store coming from Oak Cliff to downtown Dallas on the street car. Centennial Store No. 1 was located at the corner of Peak and Live Oak Streets, two main thoroughfares, the location *40 being in a rooming house area of the city. The building was a one-story brick, approximately 100 by 200 feet in dimensions, all of which was occupied by Centennial Store No. 1. Centennial Liquor Store No. 2 was located in the heart of the downtown business district of Dallas, within a block of two of the largest hotels in the city. The store was in the corner of a two-story brick building. The store covers an area of about 20 by 30 feet. Centennial Store No. 3 was located on Knox Street, in a large shopping district that adjoins the edge of Highland Park. Centennial Store No. 4 was located on Forest Avenue, in a large shopping district. Forest Avenue is used considerably as a thoroughfare into Oak Cliff. The Ace Liquor Stores were located in downtown areas, as well as in suburban districts. Generally, during 1945 and 1946, lessees of property occupied by liquor stores were required to pay higher rentals under renewal leases. University Park and Highland Park adjoin the city of Dallas in the northern part of the metropolitan area. University Park has always been dry. Highland Park has but one business center known as the "Village" with the rest of the city zoned for residences. During *41 the taxable years there was one retail liquor store in Highland Park, that store being located in the Village. The other dry area was Oak Cliff, which is in the business and residential part of the city of Dallas, west of the Trinity River. The only other buildings in the vicinity of Midway, other than the Goodie Restaurant, were the Sportatorium, a night club, and a grocery store. The owner of the grocery store took possession in January of 1946 and paid rent of $50 a month. The fixtures of the Goodie Restaurant were sold during 1945 for approximately $30,000, and the premises and building rented on a ten year lease at $600 rental per month. In its fiscal 1945 tax return Midway claimed a deduction of $2,240 for legal and professional services. The Commissioner allowed $440 of this amount and disallowed $1,800. (Goodie in its fiscal 1945 tax return claimed a deduction of $1,465 for legal and professional services.) The only explanation given in the deficiency notice was that the amount disallowed was unsubstantiated. Midway employed an accounting firm on a retainer basis of $50 a month. The accounting firm rendered an additional bill at the end of the year of $1,200, which covered *42 a number of services rendered. Opinion Midway deducted 10 per cent of its gross income as rent paid to its sole stockholder during the taxable years. No authority is needed for the statement that the mere designation of the payments as rent does not legally characterize them as such. The question is whether, in fact, the payments were deductible expenses, as rent paid under the controlling statute. The answer to this question is, of course, purely factual. The series of transactions between petitioner, Goodie and Midway appearing in the findings of fact were obviously not at arm's length. From the early days of Midway's operations it paid 10 per cent of its gross income as rent. At first it paid it to Goodie, then in 1940 when it moved to a new location it paid the rent to petitioner (the owner of all the stock of Goodie), and still later in 1942 it paid the rent to Goodie again. Petitioner entered into a lease with the Rock Island Railroad during 1940 for a tract of land for which he paid a rental of $27 a month, or $324 a year. A building was erected on the property to house the Midway Liquor Store, at a cost of $5,229.53. Midway actually paid for the erection of the building but *43 was given credit for that amount of rent paid to petitioner for the use of the premises. During 1942, petitioner leased from the Rock Island Railroad a larger acreage, which included the original tract, for which he was required to pay $89.50 a month or $1,074 a year. On November 30, 1942, petitioner assigned his interest in the lease to Goodie for $2,614.77, payment being made in the form of a promissory note, executed by Goodie, payable upon demand. Later, on July 31, 1944, another note was given by Goodie to petitioner for $1,656.01, when a revenue agent disallowed some of the depreciation claimed and increased the depreciated book value of the Midway Building from $2,614.77 to $4,270.78. Petitioner accepted payment in the form of a note even in view of the fact that Goodie was already indebted to him in an amount of over $100,000. Each transaction in the development of this case illustrates the lack of substance connected therewith. The Commissioner has determined that Midway is not entitled to a deduction for rental expense in excess of $3,600 for each of the fiscal years ending July 31, 1944, and July 31, 1945, and that the excess is in reality dividends paid under the guise *44 of rent. Section 23 (a) (1) (A) of the Internal Revenue Code provides for a deduction from income of rental payments as follows: "* * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The petitioner had the burden of proving that the amount disallowed by the respondent constituted rent as claimed on the return, and not a distribution of dividends, paid under the guise of rent, as determined by the respondent. The statute limits deductions for rent to amounts "required to be made as a condition to the continued use or possession, * * * of property * * *." It is well settled that substance controls over form in determining income tax liability. Griffiths v. Helvering, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473; Commissioner v. Court Holding Co., 324 U.S. 331. The rule applies to ownership of stock. Ralph R. Anderson, 5 T.C. 443; Carlton B. Overton, 6 T.C. 304. The circumstances here require us to consider all the evidence and determine whether the substance of the transaction is consistent *45 with its form. Both petitioner and respondent argue at great length as to what constitutes a reasonable allowance for rent. The vital question is, under the statute as already indicated, whether Midway was required to pay this particular amount as rent as a condition to the continued use or possession of the property. We think not. Petitioner controlled the complete situation in that he was the sole stockholder of Goodie, and Goodie was the sole stockholder of Midway, hence, his word was final in both corporations. Petitioner, personally, extended his influence to acquire the property on which Midway was located, for that purpose and that purpose alone. To say now that the payment of 10 per cent of the gross sales as rent, under circumstances such as exist in this case, is a requirement for the continued use or possession of the premises is not persuasive. It is evident, from all the circumstances, that in the final analysis petitioner was the decisive factor in determining the amount of rent and to whom it was to be paid. The fact that the Rock Island Railroad leased the land for $89.50 a month and the building housing the Midway Liquor Store cost only $5,229.53 some three years before *46 the first taxable year here in question are facts tending to negative the idea that the payment of rent in one of the taxable years of $18,236.99, and in the other of $16,495.01, was required for continued use or possession of the premises, where one man, the petitioner, had complete control over both the paying and the receiving of the amounts here in question. Petitioner also argues that since the parties here were not dealing at arm's length, Midway's position was strengthened by the fact that a prospective lessee could not have rented comparable property in the same vicinity; furthermore, that the lessor could have leased the premises, on the same basis, to some outside, unrelated party. We are of the opinion that petitioner has not proved either point of his argument. It is not shown that comparable property in the same vicinity could not have been rented. One of petitioner's witnesses who was engaged in the real estate business testified that they (his organization) had no locations to offer clients who desired liquor businesses in the vicinity of Midway, but we have no testimony that all possibilities for renting such premises were exhausted. We are aware of the fact that we *47 have testimony in the record that no other location in the neighborhood of Midway was available for a liquor store, yet petitioner testified as follows: "Q. What efforts had you expended on behalf of the Midway Liquor Company to keep that location down there where it has been? "A. First, I purchased a quit-claim deed from the railroad across the street from the present location at a cost of $2,500 * * *." We realize that such testimony is not conclusive that the property purchased was suitable for a liquor store; yet, without further information, the mere fact of the purchase indicates that it could be so used, particularly when petitioner's Exhibit 11 (map of Dallas indicating wet and dry territory) is examined and it appears that any property "across the street from the present location" (admitted to be across Cadiz Street, in petitioner's brief) would be in wet territory. We make this observation with full knowledge that one of petitioner's witnesses, who was engaged in the real estate business, testified that they (his organization) had no location in the neigborhood of Midway to rent to prospective clients. But other locations may have been owned by petitioner, whose refusal to *48 consider leasing could have been based on the desire to limit competition, and other realtors might have had comparable property for lease in that vicinity. The other point of the argument, that is, that the premises occupied by Midway could have been leased, on the same basis, to some outside, unrelated person, is not satisfactorily substantiated for the following reasons: Petitioner produced four witnesses at the hearing, three of them testifying that they had written letters to petitioner offering to lease Midway for 10 per cent of gross sales, the other making an offer of 11 per cent of gross sales for the opportunity to lease the liquor store. One of the letters was written "shortly before" the hearing of the case, another September 28, 1948 (the hearing of this case was November 11 and 18, 1948), another of the letters was written three or four weks before the hearing and the last was written "recently". This testimony, recently developed, does not impress us; further, it is of no value as to what kind of an offer would have been made earlier, during the taxable years. For the reasons above mentioned, we hold that petitioner has not proved that Midway was entitled to a deduction *49 for rental expense in excess of $3,600 for each of the fiscal years ending July 31, 1944, and July 31, 1945. (2) Midway claimed as a deduction for legal and professional expense an amount of $2,240, for the fiscal year ending July 31, 1945. The Commissioner allowed $440 and disallowed the excess. The only reason advanced by the respondent, as to the disallowance of the $1,800, was that the amount was unsubstantiated. Petitioner called as a witness one of the members of a firm of accountants, and as a witness he testified that they (the firm of which he was a member) did certain work for Midway (including "the usual accounting services, checking over the books each month, the making up the statement, and advising on accounting matters and tax matters, and the preparation of the tax returns") for which they made a charge of $1,800. The testimony is uncontroverted and we see no reason to disbelieve it. On brief, the respondent apparently concedes that $40 of the amount allowed was for legal expense and no further proof was required for that amount. However, the record before us is not clear as to the exact state of the remaining $400 allowed by the respondent. We have no way of determining *50 whether the $400 is a part of the $1,800 proved by the petitioner. The mere fact that the respondent allowed $440 does not of itself show that Midway expended $440 more than the $1,800, above discussed. The burden rests upon petitioner to prove his case and in view of his failure to show that the $400 allowed (and unaccounted for) was in addition to the $1,800, we can only allow $1,840 of the amount claimed. Decision will be entered under Rule 50. Footnotes
*. Second Avenue store operated 8 months.↩