Henry and Helen Pullman v. Commissioner. Jack and Victoria Pullman v. Commissioner.
Pullman v. Commissioner
Docket Nos. 2481-62, 2482-62.
United States Tax Court
T.C. Memo 1964-218; 1964 Tax Ct. Memo LEXIS 119; 23 T.C.M. (CCH) 1310; T.C.M. (RIA) 64218; August 18, 1964
Alonzo W. Watson, Jr., and C. Preston Allen, Deseret Bldg., Salt Lake City, Utah, for the petitioners. James Booher, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent *120 has determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Petitioner
Docket No.
Year
Deficiency
Henry and Helen Pullman
2481-62
1958
$10,757.72
1959
11,551.02
1960
10,257.96
Jack and Victoria Pullman
2482-62
1958
3,398.53
1959
2,464.82
1960
1,645.80
The cases were consolidated for trial and decision. The issues presented for our decision are (1) whether petitioners transferred certain shares of the nonvoting common stock of Pullman Wholesale Tailors, Inc., to the Henry Pullman Foundation during 1958, 1959, and 1960 as completed gifts within the purview of section 170 of the Internal Revenue Code of 1954; (2) whether petitioner. Henry Pullman transferred 1,670 shares of the nonvoting common stock of Pullman Wholesale Tailors, Inc., to the Salt Lake Jewish Welfare Fund during 1958 as a completed gift under section 170 of the 1954 Code; (3) in the alternative, in the event we find that either of such transfers of the nonvoting common stock of Pullman Wholesale Tailors, Inc., constituted a completed gift, whether the fair market value of the shares so transferred *121 was 51 cents, 48 cents, and 47 cents at the time of transfer during 1958, 1959, and 1960, respectively. Findings of Fact The stipulated facts have been found as stipulated. Petitioners Henry and Helen Pullman are husband and wife residing at Salt Lake City, Utah. They filed their joint income tax returns for 1958, 1959, and 1960 with the director at Salt Lake City. Petitioner Henry Pullman is sometimes hereinafter referred to as petitioner. Petitioners Jack and Victoria Pullman also are husband and wife residing at Salt Lake City. They likewise filed joint income tax returns for 1958, 1959, and 1960 with the director at Salt Lake City. Pullman Wholesale Tailors, Inc., sometimes hereinafter referred to as Tailors or the corporation, is a corporation which was organized under the laws of the State of Utah on or about July 9, 1930. Its initial capital was $2,000. The corporation was at all times here material engaged in the business of manufacturing and selling men's clothing. It operates through wholesale and controlled retail stores and salesmen primarily in Salt Lake City and Ogden, Utah, areas. It also sells men's clothing from its factory outlet which is located at Salt *122 Lake City. Its controlled retail outlets maintain cash balances sufficient to pay in full for all merchandise owned by the corporation. Tailors maintains an excellent credit position and thereby is able to purchase articles on extremely favorable terms. Its assets consist primarily of its clothing inventory and cash. The corporation during the years here involved could have liquidated its entire inventory in any of its controlled retail outlets at a profit at any time. Henry Pullman has at all times here material served as president of Tailors and Jack Pullman is its treasurer. Since its inception Tailors has been managed by Henry Pullman and has been controlled by members of the Pullman family. Immediately prior to December 14, 1955, the capital stock of Tailors consisted of 200,000 authorized and 172,181 outstanding shares of common voting stock. On or about December 14, 1955, the corporation's stockholders exchanged their old voting common stock for new voting and nonvoting common shares. The shares held by each of the stockholders of Tailors immediately before and immediately after this exchange were as follows: Shares of common
Shares of old common
held after trans-
held before trans-
action
Stockholder
action
Voting
Nonvoting
Henry Pullman
79,419.00
794.19
78,624.81
Helen Pullman (wife of
69,384.25
693.8425
68,690.4075
Henry)
Dave Pullman (brother of
1,004.00
10.04
993.96
Henry)
Jack Pullman (only child of
16,103.75
161.0375
15,942.7125
Henry and Helen)
C. Rose
6,270.00
62.70
6,207.30
172,181.00
1,721.81
170,459.19
1,721.81
172,181.00
*123 On or about December 14, 1955, the stockholders of the corporation amended its articles of incorporation to read, in part, as follows: The total authorized capital stock of the corporation shall be $400,000.00 and shall be comprised of 400,000 shares of stock having a par value of $1.00 each. Said shares shall be divided into the following classes: Class of Shares
Number
Common Voting Stock
2,000 Shares
Common Non-Voting
Stock
198,000 Shares
8% Preferred Stock
(Non-voting)
200,000 Shares
Total
400,000 Shares
The holders of preferred stock shall be entitled to receive, when and as declared by the board of directors, dividends from the surplus or net profits of the corporation at the rate of not to exceed 8% per year. Such right to dividends shall be non-cumulative. Said dividends shall be set aside and paid before any dividend shall be set aside or paid upon the shares of common stock of either class. The preferred stock shall have no voting right whatever. The entire voting power of the corporation shall be vested in the common voting stockholders. Holders of the common non-voting stock shall have the same rights as the common voting stockholders, *124 excepting that they shall have no voting rights whatever. The company may, by majority action of its voting common stockholders, retire any and all preferred stock at One Dollar ($1.00) per share upon due notice by mail to the last address of the preferred shareholders of record. In the event of any liquidation or dissolution of the corporation, the holders of the preferred stock shall be entitled to be paid in full the par value thereof. After the payment to the holders of the preferred stock above provided, the remaining assets shall be divided and paid to the holders of the common shares proportionately to their respective shares. As part of a plan for recapitalizing the corporation, Henry and Helen Pullman on or about April 8, 1956, transferred their voting common stock to Henry, Helen, and Jack Pullman as trustees of a voting trust. The trust instrument provided, in part, as follows: During the time that one or more of the below named individuals are acting as contrustees, they shall have the power to vote the stock of the Pullman Wholesale Tailors, Inc., which comprises part of the Trust Estate, in addition to all other purposes for the purpose of electing or appointing *125 part or all of them as officers, directors or employees of the corporation and to establish salaries for said services in such amounts as they shall determine in their absolute discretion. In event of dispute as to the manner of voting said stock, said power to vote shall be exercisable solely by Henry Pullman, during his lifetime. Upon his death Helen Pullman shall have said sole power to vote until such time as she may remarry. In event Helen Pullman should remarry, Jack Pullman shall have said sole power to vote during his lifetime, but upon his death Helen Pullman shall, if she survives him, resume said sole power to vote during the remainder of her lifetime. Upon the death of the survivor of the above named individuals, Dave Pullman shall have said sole power to vote during his lifetime. * * *
Jack Pullman during the period or periods, when he as cotrustee has the sole power in event of dispute to vote said stock * * * may purchase the stock of the Pullman Wholesale Tailors, Inc., comprising all or part of the Trust Estate. * * * As settlor of the above-mentioned trust, Henry reserved the right to amend, modify, and revoke the trust indenture and also the right to add *126 or withdraw assets from the trust estate. On December 23, 1955, the corporation issued 154,950 shares of preferred stock to its stockholders in the following amounts: No. of shares
acquired
December 23,
Stockholder
1955
Henry Pullman
71,475
Helen Pullman
62,445
Jack Pullman
14,490
Dave Pullman
900
O. E. Rose
5,640
154,950
During 1955 and 1956 Henry and Helen Pullman transferred their preferred stock in the corporation to (or in trust for the benefit of) various relatives. After such transfers the preferred stock of Tailors was held by relatives of Henry (and by O. E. Rose) in the following amounts: Relationship to
Stockholder
Henry Pullman
No. of shares held
Victoria Pullman
Daughter-in-law
12,000
Pamela Pullman
Granddaughter
12,000
Jack Pullman
Son
26,490
Dave Pullman
Brother
12,900
Olga Pullman
Sister-in-law
12,000
Paul Pullman
Nephew
12,000
Jerry Pullman
Nephew
12,000
Pamela and Francine Pullman,
Trust #101
Trustee: Henry Pullman
24,960
Pamela and Francine Pullman,
Trust #201
Trustee: Henry Pullman
24,960
O. E. Rose
None
5,640
154,950
The dividends paid by Pullman Wholesale *127 Tailors, Inc., throughout the period 1944 to 1962, inclusive, were as follows: Stock
Cash
Year
%
Amount
%
Amount
1944
3
$ 1,291.36
1945
5
2,152.27
1946
5
2,152.27
1947
5
2,152.27
1948
5
2,152.27
1949
100
$ 43,045.25
5
4,304.52
1950
100
86,090.50
3
5,165.43
1951
3
5,165.43
1952
3
5,165.43
1953
3
5,165.43
1954
3
5,165.43
1955
9/10
154,950.00 *
12.89 *
share for
each share
com. *
1956
1957
6 (pref.)
9,297.00
1958
8 (pref.)
12,396.00
1959
8 (pref.)
12,396.00
3 (com.)
5,043.09
(N.V.)
1960
1961
1962
No dividends were paid in 1960, 1961, and 1962 because of additional expenses incurred as a result of opening a new store located in Ogden, Utah, and the cost of initiating a road selling program. The corporation's net income after taxes and its accumulated earnings at the end of each of the years 1950 to 1960, inclusive, were as follows: Accumulated
Year
Net income
earnings
1950
$29,878
$107,880
1951
15,114
117,797
1952
18,230
130,861
1953
22,152
147,849
1954
19,087
161,770
1955
17,791
23,615
1956
10,745
34,034
1957
14,911
39,649
1958
18,768
45,692
1959
14,706
42,959
1960
5,472
48,342
*128 The total shareholders' equity in Tailors as of December 31, 1955 through December 31, 1960, was as follows: Year
Amount
1955
$333,951.99
1956
358,991.93
1957
364,606.58
1958
368,979.39
1959
366,246.66
1960
371,719.57
The salary paid by the corporation to Henry as president during the period 1944 through 1962, inclusive, was as follows: Year
Amount
1944
$15,000
1945
20,000
1946
$20,000
1947
20,000
1948
25,000
1949
25,000
1950
25,000
1951
25,000
1952
25,000
1953
25,000
1954
25,000
1955
25,000
1956
25,000
1957
25,000
1958
25,000
1959
25,000
1960
25,150
1961
25,000
1962
25,000
Jack Pullman's salary as treasurer during the years 1951 to 1962, inclusive, was as follows: Year
Amount
1951
$ 1,500.00
1952
4,824.40
1953
8,120.00
1954
9,531.68
1955
8,900.00
1956
11,437.68
1957
13,955.14
1958
15,046.62
1959
14,119.97
1960
12,950.00
1961
12,800.00
1962
12,800.00
The salary paid by the corporation to Helen as vice president through the years 1944 to 1962, inclusive, was $5,000 per year except for the years 1952 through 1959 when her salary was $5,250 per year. *129 On December 26, 1956, petitioner transferred 2,174 shares of the nonvoting common stock of the corporation to the Salt Lake Jewish Community Center. On January 2, 1957, petitioner transferred 5,200 shares of the corporation's nonvoting common stock to each of the following family members: Jack, Victoria, Pamela, Francine, David, Olga, Paul, and Jerry Pullman. Each of the above-listed gifts of common stock made to family members on January 2, 1957, was reported by Henry on his Federal gift tax returns at a fair market value of $6,000. On February 24, 1958, Henry unconditionally transferred 1,670 shares of the corporation's nonvoting common stock to the Salt Lake Jewish Welfare Fund. The gifts made by petitioner to the Jewish Community Center and the Jewish Welfare Fund and to various members of his family were made for the purpose of providing each recipient with a source of income and an opportunity to participate in the potential growth of Tailors. The 2,174 shares of the corporation's nonvoting common stock given by petitioner to the Jewish Community Center were subsequently redeemed by the corporation at a total price of $2,500. The 1,670 shares of nonvoting common stock *130 given by Henry to the Jewish Welfare Fund were redeemed by Tailors in April 1958 for $2,000. During July 1958, petitioner organized the Henry Pullman Foundation, sometimes hereinafter referred to as the Foundation, a nonprofit corporation organized under the laws of the State of Utah for charitable purposes. During the years in issue the officers and directors of the Foundation were Henry, Helen, and Jack Pullman. By letter ruling, dated April 15, 1960, the Henry Pullman Foundation was advised by the Commissioner that it satisfied the requirements of a tax-exempt organization under the terms of section 501 of the 1954 Code. The articles of incorporation of the Henry Pullman Foundation provide that - In the event of the dissolution of the corporation all of its assets and property undistributed prior thereto shall be distributed to such other corporations, associations or agencies as have one or more of the same purposes as this corporation and in such proportion as the Executive Board by appropriate resolution shall determine. Henry also made cash contributions to the Henry Pullman Foundation on the dates and in the amounts as follows: May 19, 1960
$1,000.00
June 2, 1960
500.00
January 6, 1961
1,000.00
July 12, 1962
400.00
July 19, 1962
550.00
August 7, 1962
450.14
August 21, 1962
500.00
October 10, 1962
712.00
*131 The Henry Pullman Foundation made disbursements to various charities during the years and in the amounts as follows: Fiscal year ended
July 31
Amount
1959
$1,686.50
1960
2,225.00
1961
2,098.00
1962
2,700.00
As of December 31, 1958, 1959, and 1960, the total stockholders' equity in the corporation, the equity of the preferred shareholders (valued at par, i.e., $1 per share), the equity of the common shareholders, the total number of common shares outstanding, and the book value per share of the common stock were as follows: Equity of preferred
No. of
Equity per
Total
valued at par:
Equity of
common
share
Year
equity
$1 per share
common
shares
common
1
2
1 minus 2
1958
$368,979
$154,950
$214,029
168,337
$1.27
1959
366,246
154,950
211,296
168,337
1.26
1960
371,719
154,950
216,769
168,337
1.29
During the years 1958, 1959, and 1960, petitioners unconditionally transferred the indicated number of nonvoting common shares of Tailors to the Henry Pullman Foundation, claimed deductions therefor on their income tax returns, and listed the fair market value thereof as follows: No. of
shares
Total value of
Value per
trans-
contribution
share per
Deduction
Petitioner
Year
ferred
per return
return
claimed
Henry and
1958
14,000
$15,960.00
$1.14
$15,960.00
Helen Pullman
1959
14,260
16,400.00
1.13
16,400.00
1960
13,200
18,000.00
1.15
17,103.42 [1]
Jack and
1958
6,500
7,410.00
1.14
7,410.00
Victoria
Pullman
1959
6,087
7,000.00
1.13
6,253.81 [1]
1960
3,355.7
4,194.64
1.15
4,194.64
Total
57,402.7
*132 In his deficiency notices the respondent disallowed in full the charitable deductions claimed by petitioners on their income tax returns for 1958, 1959, and 1960. The respondent determined, in the alternative, that if, in fact, completed gifts of the corporation's nonvoting common stock were made during each of those years, the fair market value of such shares at the time of transfer to the Foundation was 1.4 cents per share. Ultimate Findings The 57,402.7 shares of nonvoting stock of Tailors transferred by petitioners to the Henry Pullman Foundation during 1958, 1959, and 1960 were bona fide gifts as to which petitioners surrendered their dominion and control at the time of transfer. Petitioner likewise made a completed gift of 1,670 nonvoting common shares of the corporation to the Salt Lake Jewish Welfare Fund during 1958. The fair market value of the nonvoting common shares of Pullman Wholesale Tailors, Inc., transferred by petitioners to the Foundation during 1958, 1959, and 1960, and the fair market value of the 1,670 shares transferred to the Salt Lake *133 Jewish Welfare Fund during 1958 was 95 cents per share at the time of transfer. Opinion Issue 1. Transfer of Stock The respondent has determined that the transfer by Henry and Helen Pullman and Jack and Victoria Pullman of a total of 57,402.7 nonvoting shares of the common stock of Tailors to the Henry Pullman Foundation during 1958, 1959, and 1960 was lacking in substance and therefore was not a completed gift under section 170 of the 1954 Code. [1]
Petitioners contend that they completely surrendered their dominion and control over the 57,402.7 shares of Tailors' nonvoting common stock which they transferred to the Foundation during the years in issue. The respondent's regulations pertaining to completed gifts under section 170 of the Code state as follows: *134 If a taxpayer unconditionally delivers (or mails) a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery (or mailing, provided that such certificate is received in the ordinary course of the mails). * * * [Sec. 1.170-1(b), Income Tax Regs.] Unquestionably the shares of stock here involved were delivered unconditionally to the Foundation which at all times here material was an exempt charitable organization. The respondent has not revoked the exemption ruling issued April 15, 1960, in which he ruled that the Foundation was a tax-exempt organization under section 501 of the Code, nor does he contend here that during the years in issue the Foundation did not so qualify under that section. The respondent claims that petitioners did not surrender their dominion and control over the shares of stock transferred to the Foundation and that the Foundation therefore will not receive the actual enjoyment of the purported gifts of the Tailors' stock. It is his contention that Henry, Helen, Jack, and Victoria Pullman in effect reserved for themselves and their heirs the power to control the *135 corporation, the entire right to receive dividends and the right to participate in the assets of Tailors on liquidation. He thus concludes that petitioners parted with no substantial part of their actual interest in the ownership and control of the corporation. It is true, as respondent points out, that the Foundation, as a holder of nonvoting common stock of Tailors, has no voice in its management and operation. However, under the provisions of the Utah Business Corporation Act, 2 Utah Code Ann. secs. 16-10-1 - 16-10-143 (1962), the holders of nonvoting stock nevertheless are entitled to exercise voting rights with respect to (1) a sale, lease, exchange, mortgage pledge, or other disposition of all or substantially all of the corporate assets if not made in the regular course of business, [2] (2) reorganizations, such as mergers or consolidations, [3] and (3) voluntary dissolution of the corporation. [4] Further, the Utah Business Corporation Act prevents the amendment of the articles of incorporation in such a way as to lessen the rights of minority interests and the holders of nonvoting stock. *136 [5] Such common stock would also be entitled to share in the assets of the corporation on liquidation after the preferred stockholders have received the par value of their stock. [6]
The respondent argues that Tailors could not pay dividends to the holders of its common stock without first paying $12,396 to its preferred shareholders and that the Foundation accordingly would have no prospect of sharing in the earnings of the corporation. In support of his contention on this point he relies in part upon the provisions in the corporation's amended articles which state: The holders of the preferred stock shall be entitled to receive, when and as declared by the board of directors, dividends from the surplus or net profits of the corporation at the rate of not to exceed 8% per year. Such right to dividends shall be non-cumulative. Said dividends shall be set aside and paid before any dividend shall be set aside or paid upon the shares of common stock of either class. *137 * * * Respondent insists that in view of these provisions no dividend could be declared on common stock without first declaring an 8 percent dividend to Tailors' preferred stockholders. Henry Pullman testified that by the above-stated provisions in the articles of incorporation it was intended only to impose an 8 percent ceiling on the dividends payable to the preferred stockholders and that it was his understanding that the corporation had the power to pay the preferred stockholders less than 8 percent in dividends if it so desired and also to pay dividends to its common stockholders in the same year. The language of the amended articles which reads "at the rate of not to exceed 8% per year" [emphasis added], would seem clearly to support petitioner's view. *
*138 Even if the respondent is correct in contending that a full 8 percent dividend must always be paid to the preferred shareholders before the holders of the corporation's common stock can share in its earnings, its earnings history discloses that during the period 1950 to 1960, inclusive, there were only 2 years during which its net income (after taxes) did not exceed an amount equal to 8 percent of the par value of the outstanding preferred stock. Subsequent to the issuance by Tailors of its preferred shares on December 23, 1955, the corporation paid cash dividends to its preferred shareholders in 1957, 1958, and 1959 in the amounts of $9,297, $12,396, and $12,396, respectively. During 1959 it paid to its common stockholders (including the Foundation) a 3 percent cash dividend totaling $5,043.09. Accordingly, it is clear that the Henry Pullman Foundation, as a holder of Tailors' common stock, not only could have shared in its earnings but, in 1959, it actually did so participate. The respondent further contends that, by virtue of their ownership of all of the outstanding voting stock of the corporation, petitioners might prevent the Foundation from receiving either current dividends *139 or liquidating distributions by withdrawing excessive salaries from Tailors in amounts so substantial as to virtually strip the corporation of its assets. We cannot agree that the record so indicates. As officers and directors of Tailors, petitioners possess no right whatever to milk off the earnings of the corporation through excessive salary payments or to otherwise strip it of its income-producing assets. As officers and directors of Tailors, petitioners stand in a fiduciary relationship to the minority stockholders, and it is their duty to exercise good faith so as to cause the corporation to produce the most income possible and to protect the interests of minority stockholders. Pepper v. Litton, 308 U.S. 295; Kaufman v. Commissioner, 175 F. 2d 28; Hill v. Erwin Mills, Inc., 239 N.C. 437, 80 S.E. 2d 358. [7]
*140 It further appears that the withdrawal of excessive salaries from the corporation by petitioners would frustrate their purpose in causing the issuance of the nonvoting common stock. It is clear from the record that it was the intention of the directors of Tailors in issuing the nonvoting common shares to provide dividend income to the recipients of such stock - the younger members of the Pullman family as well as the Foundation. The record further shows that the corporation's salary payments were such as to present a very stable salary pattern over a 20-year period both before and after the issuance of nonvoting common stock. It appears that the possibility of such an illegal stripping of corporate earnings and assets by petitioners is so unlikely as to be of no consequence. In further support of his position here, the respondent relies on Marjorie M. Merritt, 29 T.C. 149, and Overton v. Commissioner, 162 F. 2d 155, affirming 6 T.C. 304. In Marjorie M. Merritt, supra, the taxpayer was the owner of stock in a family-owned corporation. For the purpose of preventing persons who were not members of the owning family from acquiring *141 stock in the corporation, a trust agreement was executed which restricted stock ownership to the existing shareholders and their descendants. Under the trust agreement the shareholders expressly gave themselves the right to receive distributions out of the corporate capital. We there sustained the taxpayer's contention that no completed gift of the corporate shares to the remaindermen had occurred for gift tax purposes. We pointed out that, because the existing shareholders were also directors of the corporation and had expressly given themselves the right to receive distributions out of capital, as well as the right to all dividends, they, in effect, had the power to divest the remaindermen of the substance of their prospective interests in the corporate property. Because of the express power of the shareholders to strip their shares of value, we were unable to find that an effective gift for gift tax purposes had taken place. Unlike the situation presented in Marjorie M. Merritt, supra, petitioners here have no right to divest the holders of the nonvoting common stock, including the Foundation, of their interests in the property of the corporation. The owners of *142 Tailors' nonvoting common stock are entitled under the articles of incorporation and under the statutes of the State of Utah to participate in the assets of the corporation on liquidation after the preferred shareholders have received the par value of the stock. Petitioners have no power to divest the holders of the nonvoting common stock of their rights in the assets of Tailors without committing an illegal act. We consequently regard the situation here presented as factually distinguishable from Marjorie M. Merritt, supra. In Overton v. Commissioner, supra, the taxpayer was a shareholder in a New York corporation which had 1,000 shares of stock outstanding. The shareholders amended the articles of incorporation and completed a plan of recapitalization under which they exchanged their old shares of stock for 2,000 new shares of the corporation, of which 1,000 shares were designated as class A and 1,000 shares as class B stock. The shareholders retained the class A shares and each gave the class B stock to his wife. The class A stock alone was voting stock. The class B stock, which was nonvoting stock, was severely restricted as to the possibility of *143 alienation in the hands of the shareholders' wives. However, the class B stockholders received approximately twice as much by way of dividends as did the holders of the class A stock. The Court of Appeals for the Second Circuit there held that the taxpayers who were the holders of the class A stock had parted with no substantial portion of their interests in the corporate property and had actually given their wives nothing but the right to receive the future earnings which would flow from the retained class A stock. The Court therefore held that the arrangement amounted to nothing more than an anticipatory assignment of dividend income which properly was taxable to class A stockholders. Inasmuch as the Henry Pullman Foundation acquired unrestricted rights of ownership and alienation of nonvoting common stock of the Pullman Wholesale Tailors, Inc., transferred to it by petitioners, and since it is clear that the Foundation received substantial proprietary rights in the assets of the corporation rather than a mere right to receive future dividend income, we regard Overton v. Commissioner, supra, as clearly distinguishable from the instant case. As we view the situation *144 here presented, petitioners effectively transferred certain shares of nonvoting common stock of Tailors to the Foundation during 1958, 1959, and 1960 without retaining any right to recapture the shares so transferred, to recover the assets of the Foundation, or to strip the corporation and its shares of their value. Despite the fact that both the corporation and the Foundation were controlled during the years in issue by Henry, Helen, and Jack Pullman, the Foundation nevertheless acquired a substantial proprietary interest in the assets of Tailors upon receipt of the nonvoting common stock. We therefore are of the opinion that petitioners by the transfer of the shares in question made valid and completed gifts of the shares of stock so donated on the date of transfer under section 170 of the Code. Issue 2. Transfer of Stock to Salt Lake Jewish Welfare Fund In their petition, petitioners Henry and Helen Pullman claimed that on February 24, 1958, Henry transferred 1,670 shares of the corporation's nonvoting common stock to the Salt Lake Jewish Welfare Fund. The respondent contends that Henry Pullman failed to make a completed gift of these shares in 1958. The shares in question *145 were unconditionally delivered to the Salt Lake Jewish Welfare Fund on February 24, 1958, and were redeemed by the corporation for $2,000 (approximately $1.20 per share) during April 1958. For the reasons set forth under issue 1, supra, and from the facts in the record relating to this transfer, we are convinced that Henry made a completed bona fide gift of the 1,670 nonvoting common shares of Tailors on February 24, 1958. We so hold. Issue 3. Value of Stock In his statutory notices of deficiency, the respondent determined in the alternative that, in the event we find that petitioners made completed gifts of the nonvoting common stock of Tailors during the years in issue, the fair market value thereof at the time of transfer was 1.4 cents per share. On brief, however, the respondent concedes that the fair market value of the nonvoting common shares of the corporation during 1958, 1959, and 1960 was 51 cents, 48 cents, and 47 cents, respectively. Petitioners contend that the fair market value of the corporation's nonvoting common shares at the time of transfer was not less than $1.14, $1.13, and $1.15 during 1958, 1959, and 1960, respectively, the per share value claimed *146 by them on their income tax returns for those years. Apart from the 2,174 shares of the corporation's nonvoting common stock donated by Henry Pullman to the Salt Lake Jewish Community Center in 1956 and redeemed by Tailors at a price of $1.15 per share, and the 1,670 shares donated to the Salt Lake Jewish Welfare Fund which were redeemed by the corporation in 1958 for approximately $1.20 per share, there is no evidence in the record of any sales transactions involving the stock of the corporation. The book value per share of the corporation's common stock was $1.27, $1.26, and $1.29 for 1958, 1959, and 1960, respectively. After carefully considering the expert testimony presented and taking into account the growth and earnings history of the corporation, its dividend record, its experienced management and stability, the book value of its stock, its earning power potential based upon the return realized on its productive capital, the nature of the business, the absence of voting rights on the common stock in question, and all other relevant factors, it is our opinion from the record as a whole that the fair market value of the nonvoting common shares of Pullman Wholesale Tailors, *147 Inc., at the time of the transfer to the Henry Pullman Foundation during 1958, 1959, and 1960 was 95 cents per share, and we so hold. We further hold for the above-stated reasons that the fair market value of the 1,670 nonvoting common shares of the corporation which were transferred by petitioner Henry Pullman to the Salt Lake Jewish Welfare Fund on February 24, 1958, was 95 cents per share on that date. Decisions will be entered under Rule 50. Footnotes
*. By order of the Tax Court dated 9/22/64 and signed by Judge Withey↩, these figures were transferred from a position opposite the year 1957.
1. Deduction limited to percentage of adjusted gross income prescribed by section 170(b)(1)↩ of the 1954 Code.
1. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. - (1) General Rule. - There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year * * *↩
2. 2 Utah Code Ann. sec. 16-10-74↩ (1962). 3. 2 Utah Code Ann. sec. 16-10-68↩ (1962). 4. 2 Utah Code Ann. sec. 16-10-79↩ (1962). 5. 2 Utah Code Ann. sec. 16-10-56↩ (1962). 6. 2 Utah Code Ann. sec. 16-10-93↩ (1962).
*. By order of the Tax Court dated 9/22/64 the following sentence was removed: "That the directors of the corporation so understood these provisions in the articles of incorporation is evidenced by the fact that in 1957, after paying the preferred stockholders a dividend of only 6 percent of the par value of their stock, Tailors capitalized $154,950 of its retained earnings out of which it paid its common stockholders a stock dividend of nine-tenths of one share of common for each share of common outstanding."↩
7. It would appear that section 162(a)(1)↩ of the Code which allows a deduction only for "reasonable" compensation payments would serve as an additional restraint on such manipulations.